1  VICTORIA K. HALL (STATE BAR NO. 240702)
   LAW OFFICE OF VICTORIA K. HALL
2  401 N. WASHINGTON ST. SUITE 550
   ROCKVILLE MD 20850
3  Victoria@vkhall-law.com
   Telephone: 301-738-7677
4  Facsimile: 240-536-9142

5  Attorney for Plaintiff
   ROBERT JACOBSEN

6

7

8               UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11

12 ROBERT JACOBSEN, an individual        CASE NO.

13              Plaintiff                 COMPLAINT
                                          FOR DECLARATORY
14 MATTHEW KATZER, an individual,         JUDGMENT, FOR VIOLATIONS
   KAMIND Associates, Inc., an Oregon     OF ANTITRUST LAWS,
15 corporation, dba KAM Industries, and   CALIFORNIA BUSINESS AND
   KEVIN RUSSELL, an individual           PROFESSIONS CODE § 17200,
16                                        AND LANHAM ACT, AND
                Defendants                FOR LIBEL

17                                        DEMAND FOR JURY TRIAL

18 Plaintiff, Robert Jacobsen, alleges as follows:

19 I. NATURE OF ACTION

20    1. This is an action for declaratory judgment that U.S. Patent No. 6,530,329 ("the

21       '329 patent") is invalid, unenforceable, void and/or not infringed by Plaintiff

22       Jacobsen. A true and correct copy of the '329 patent is attached in Exhibit A. This

23       is also a complaint for violation of federal antitrust laws, the Lanham Act, and

                                          Complaint and Demand for Jury Trial

1    California Unfair Competition Act and for libel. This matter stems from a dispute

2    between Plaintiff Robert Jacobsen, a developer of open source software who

3    offers the software free to the public via the Internet, and Defendant Matthew

4    Katzer, a patentee who sells software products embodying what he claims are

5    valid and enforceable patents.

6    II. THE PARTIES

7    2.   Robert Jacobsen ("Jacobsen") is an individual living in Berkeley, California. He

8         works for the Lawrence Berkeley National Laboratory ("Lab") of the University

9         of California and teaches physics at the university. He is a model train hobbyist

10        who has written, with others, open source software code called JMRI (Java Model

11        Railroad Interface) which allows him and other model train hobbyists to control

12        how the trains move on track. Plaintiff Jacobsen, a primary developer and

13        distributor of the software through the JMRI Project, makes this software

14        available on the internet, free of charge, but allows hobbyists to donate to support

15        the project. His experience with model train control systems is such that he is an

16        expert in the field.

17   3.   Matthew Katzer ("Katzer") is an individual living in Oregon. He is also a model

18        train hobbyist who has written software code for controlling model trains on train

19        tracks. On information and belief, he has substantial wealth, recently making a

20        large donation to his alma mater. He has obtained several utility patents, and on

21        information and belief, has several patent applications pending at the time this

22        complaint was filed. His experience with model train control systems is such that

23        he is also an expert in the field.

Complaint and Demand for Jury Trial

1    4.   KAMIND Associates, Inc. ("KAM") is an Oregon corporation with its principal

2         place of business at Hillsboro, Oregon. It does business as KAM Industries. On

3         information and belief, KAM is owned by Defendant Katzer. On information and

4         belief, KAM is in the business of selling products embodying what Defendant

5         Katzer said were his inventions, which Defendant Katzer claimed in the patents

6         issued to him. KAM's products range in list price from $49 to $249.

7    5.   Kevin Russell is an individual practicing law in Portland, Oregon. On information

8         and belief, Defendant Katzer and Defendant KAM hired Defendant Russell,

9         through his employer Chernoff, Vilhauer, McClung & Stenzel LLP, to prosecute

10        patent applications and enforce their fraudulently obtained and invalid patents.

11   III. JURISDICTION AND VENUE

12   6.   This action arises under patent laws of the United States (35 U.S.C. § 1 *et seq.*),

13        antitrust laws of the United States (15 U.S.C. § 1 *et seq.*), the Lanham Act (15

14        U.S.C. § 1051 *et seq.*), California's Unfair Competition Act (California Business

15        & Professions Code § 17200 *et seq.*) and laws authorizing declaratory judgment

16        actions (28 U.S.C. §§ 2201-2202). Defendants' conduct has put Jacobsen in

17        reasonable and serious apprehension of imminent suit for infringement of the '329

18        patent. Based on the allegations in Paragraphs 11 through 72, there is a conflict of

19        asserted rights between Plaintiff Jacobsen and Defendants Katzer and KAM, and

20        thus an actual controversy exists between Plaintiff Jacobsen and Defendants

21        Katzer and KAM as to the validity, scope, enforceability and infringement of the

22        '329 patent. Defendants' conduct has violated federal antitrust and trademark

23        laws, and the California Unfair Competition Act, and they have libeled him.

Complaint and Demand for Jury Trial

1      7.  This Court has personal jurisdiction over the defendants. Plaintiff Jacobsen is the

2          main contact for the JMRI Project. Defendant Katzer has repeatedly directed

3          charges of infringement against Plaintiff Jacobsen. Through their attorney

4          Defendant Russell, Defendant Katzer and Defendant KAM have repeatedly sent

5          monthly bills in excess of $200,000 to Plaintiff Jacobsen's Berkeley, California

6          home address. Through their attorney Defendant Russell, Defendant Katzer and

7          Defendant KAM have filed a Freedom of Information Act ("FOIA") request with

8          the U.S. Department of Energy ("DOE"), falsely accusing Plaintiff Jacobsen of

9          patent infringement. The FOIA request sought to gain access to, among other

10         things, all of Plaintiff Jacobsen's e-mails relating to JMRI, and made no exception

11         for privileged e-mails between plaintiff's counsel and Jacobsen. The FOIA

12         request interfered with Plaintiff Jacobsen's work, and required him to discuss the

13         infringement matter with his employer, and Lab counsel as well as the DOE FOIA

14         liaison. Plaintiff Jacobsen had to divert significant work time from other projects

15         to deal with the false accusations of patent infringement, and the FOIA request,

16         resulting in a loss of income. Defendants committed these acts in an attempt to

17         force Plaintiff Jacobsen to shutdown his software or force him to pay Defendant

18         Katzer and Defendant KAM royalties on Katzer's fraudulently obtained and

19         invalid patents. Thus, Defendants' conduct resulted in injury in this jurisdiction.

20     8.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332,

21         1337, 1338(a), 2201, and 2202, and supplemental jurisdiction, 28 U.S.C. § 1367.

22     9.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).

23  ////

Complaint and Demand for Jury Trial

IV. INTRADISTRICT ASSIGNMENT

10. This case is exempt from Local Rule 3-2 because it is an intellectual property

matter.

V. FACTS

A. BACKGROUND

11. Model trains are a popular hobby for all people, young and old. Many model train

enthusiasts create elaborate systems of tracks traveling through small scale cities,

towns, tunnels, and mountains, and criss-crossing other train tracks. Some

hobbyists have multiple trains running at the same time, which creates problems

for controlling the trains. Prior to advances in control system technology, if two

trains were on the same train track, a signal designating speed and direction, sent

to one train, was by default sent to the other train. Also, if two controllers sent

signals to two different trains, one train could cause the other to derail.

12. Through advances made in the 1980s and 1990s, hobbyists could control separate

trains, either on the same track or different tracks, and in such a manner that the

chances of derailment, or other problems, were reduced. Defendant Katzer was

one of many hobbyists involved in the control system advances. For example, in

the mid-1990s, a group of small companies created a multi-train control system

called "Digital Command Control" ("DCC"). A large group of hobbyists, called

the National Model Railroad Association ("NMRA"), created a semi-open

standard for DCC. On information and belief, Defendant Katzer was a part of the

group that created the DCC standard.

Complaint and Demand for Jury Trial

13. Defendant Katzer frequently talked with other hobbyists about their control systems and obtained model train control systems products from other manufacturers or on his own. Then, Defendant Katzer filed patent applications covering these technologies, which he knew he did not invent, or he jointly invented with others. He also withheld material references and other information to trick the Patent Office into issuing patents to him.

B. DEFENDANT KATZER INTENTIONALLY WITHHELD MATERIAL REFERENCES REPEATEDLY WHEN HE FILED PATENT APPLICATIONS

14. Defendant Katzer filed numerous applications for patents on model train control systems, beginning with patent application 09/104,461 ("the '461 application"), filed on June 24, 1998, which matured into U.S. Patent No. 6,065,406 ("the '406 patent"). From the '461 application stemmed several continuation applications, from which issued a number of other patents, including the '329 patent.[1] Although aware of others' control systems, Defendant Katzer intentionally did not list the information on the Information Disclosure Sheet. He intentionally withheld the information from the patent examiner and claimed a multi-train control system that been published, in public use, offered for sale and sold years before. Defendant Katzer also intentionally withheld information about Defendant KAM's products, which include multi-train control systems that were in public use, published, offered for sale or sold more than 1 year before Defendant Katzer filed the '461 application.

---

[1] The '329 patent issued from patent application 10/124,878 ("the '878 application"), which was filed April 17, 2002 and claimed benefit of the filing date of patent application 09/858,222. This patent application, in turn, claimed benefit of the filing date of patent application 09/550,904, which claimed benefit of the filing date of the '461 application.

Complaint and Demand for Jury Trial

1   i. THIRD PARTIES MATERIAL REFERENCES WHICH DEFENDANT KATZER

2   WITHHELD DURING PROSECUTION OF '461 APPLICATION AND LATER

3   APPLICATIONS

4   15. Marklin, Inc. of Germany introduced a system in 1986 that permitted multi-train

5   control called "Command Control", consisting of a command center which

6   received controls from outside sources (such as a computer or a hand-held

7   controller device), and directed the control signal to a designated train. This

8   system was in public use, advertised and sold beginning in either the late 1980s or

9   early 1990s. Defendant Katzer was aware of Marklin's work. Defendant Katzer

10   intentionally did not list this reference on the Information Disclosure Sheet. He

11   intentionally withheld Marklin's Command Control from the patent examiner.

12   16. In 1993, Dr. Hans Tanner of Digitoys released WinLok 1.5, a software program

13   which allowed multi-train control. In 1995, Dr. Tanner released WinLok 2.0

14   which incorporated other advances in train control. The WinLok programs are

15   known to model train enthusiasts, and were reviewed in Model Railroading

16   magazine in March 1995 (WinLok 1.5) and December 1995 (WinLok 2.0). The

17   programs compete with Defendant KAM's products. In his patent applications,

18   Defendant Katzer referred to software published by Digitoys, but he intentionally

19   did not identify it on the Information Disclosure Sheet nor did he provide a copy

20   of it or its manual to the patent examiner. The only Digitoys software programs

21   that Defendant Katzer could have been referring to is the WinLok series. On

22   information and belief, Defendant Katzer withheld this information because he

23   did not want the patent examiner to consider it during prosecution. On

Complaint and Demand for Jury Trial

1    information and belief, Defendant Katzer knew that it would bar claims in his

2    patent applications. But Defendant Katzer knew that there was independent

3    evidence that showed he knew about the WinLok series, so he knew he had to

4    disclose the reference. On information and belief, the reason Katzer mentioned a

5    Digitoys program in the specification was so that, if he were accused of

6    withholding the reference, he could later argue that he did tell the patent examiner

7    about it. The effect of making a general reference to the WinLok series in the

8    specification, and not listing it in the Information Disclosure Sheet, was that the

9    patent examiner did not consider the software program as prior art or a reference

10    when examining the claims.

11   17. A. J. Ireland, of Digitrax, developed a DCC system called "Challenger" in 1993

12    and introduced it at the NMRA National Convention in Valley Forge, PA. Mr.

13    Ireland later introduced another DCC system called "Big Boy", which he sold

14    through his company beginning in September 1994. "Big Boy" used technology

15    similar to a simple computer network to interconnect parts of the model railroad

16    system – one or more throttles (hand-held computer devices) used to control

17    individual trains, personal computers to control individual trains, and a command

18    station to route control signals to one or more trains. This system is called

19    "LocoNet". This system and the Digitrax products compete with Defendant

20    KAM's products. Defendant Katzer requested and received the LocoNet

21    specification in 1994 or 1995. Mr. Ireland then developed the "Chief" DCC,

22    which embodies advances over "Big Boy". Ireland sold "Chief" through Digitrax

23    beginning in 1996. Defendant Katzer was aware of Digitrax' products and

Complaint and Demand for Jury Trial

LocoNet, but he intentionally did not list them on the Information Disclosure Sheet. He intentionally withheld these references from the patent examiner.

18. In 1993, Train Track Computer Systems introduced "Track Driver Professional 32" ("TD Pro"), software for prototype railroads that contains the client-server features which Defendant Katzer claimed years later in the '461 application. On information and belief, Defendant Katzer worked with Train Track Computer Systems prior to filing the '461 application, thus he knew about TD Pro's capabilities. But Defendant Katzer intentionally did not list them on the Information Disclosure Sheet. He intentionally withheld information about TD Pro from the patent examiner.

19. Beginning in 1994, at conferences in the United States and Europe, LocoNet technology was publicly used to demonstrate multi-train control through a network. Conference organizers published notices and advertisements of such demonstrations. On information and belief, Defendant Katzer was aware of this information, but he intentionally withheld it from the patent examiner.

20. Strad Bushby of Silver Spring, MD, used the Digitrax products starting in 1995 to build a system involving multiple interconnected computers for running trains on a model railroad. His activities were advertised in programs at area model railroad conventions beginning in 1996, and tour buses of model railroad enthusiasts came to his home to see his control systems set-up. Mr. Bushby discussed his model train control systems with Defendant Katzer before Defendant Katzer filed his patent applications, but Defendant Katzer intentionally

Complaint and Demand for Jury Trial

1   withheld the information regarding Mr. Bushby's control system from the patent

2   examiner.

3   21. In May 1996, John E. Kabat created software, called LOCONET1 v. 1.2, which

4   could interface with the LocoNet network, thus allowing other programs to send

5   commands, one program at a time, to trains through LocoNet. By early February

6   1997, Kabat had created a more advanced version of his program, called

7   LOCONET.VxD, which worked in MICROSOFT Windows systems. This

8   version of the software, offered to the public for free via download, allowed

9   multiple programs to communicate with the LocoNet system, and queue

10  commands to be sent to their corresponding trains. Defendant Katzer had multiple

11  conversations with Kabat about these software programs. Defendant Katzer

12  included discussions of Kabat's programs in his own presentations at the NMRA

13  conventions in 1996, 1997 and 1998. However, Defendant Katzer intentionally

14  did not list any of the Kabat programs on the Information Disclosure Sheet. He

15  intentionally withheld information about the Kabat programs from the patent

16  examiner.

17  22. Mr. Juergen Freiwald of Egmating, Germany wrote and sold software under the

18  names "Railroad and Co." and "TrainController". This software competes with

19  Defendant KAM's products. Versions made publicly available starting in 1995

20  could control multiple trains from multiple programs via multiple control systems.

21  Defendant Katzer knew of these programs, and included information about them

22  in his presentations at the NMRA conventions in 1997 and 1998. However,

23  Defendant Katzer intentionally did not list it on the Information Disclosure Sheet.

Complaint and Demand for Jury Trial

1    He intentionally withheld information about Freiwald's software programs from

2    the patent examiner.

3    23. During 1997, Stanley Ames, Rutger Friberg and Edward Loizeaux wrote a book

4    called "Digital Command Control - the comprehensive guide to DCC" which

5    described various control system aspects later claimed in Katzer's patent

6    applications. Defendant Katzer contributed to this book, and signed its

7    introduction as an explicit endorsement of its contents. Defendant KAM has

8    offered the book for sale. However, Defendant Katzer intentionally did not list

9    the book on the Information Disclosure Sheet. He withheld information about this

10    book from the patent examiner. While examining one of Katzer's continuation

11    applications recently, a patent examiner independently located the book and cited

12    it in rejecting claims.

13    24. At the DCC Working Group meeting at the NMRA National Convention in early

14    August 1997, Dr. Tanner of Digitoys gave a presentation on Railroad Open

15    System Architecture (ROSA), which described multi-train control using a

16    network. Dr. Tanner used several slides to describe ROSA. Defendant Katzer was

17    a member of the DCC Working Group at the time, and attended the presentation.

18    Defendant Katzer intentionally did not list this presentation on the Information

19    Disclosure Sheet. He intentionally withheld information about the presentation

20    from the patent examiner.

21    25. In October 2002, Dr. Tanner and Mr. Freiwald reminded Defendant Katzer and

22    Defendant Russell of their products, and stated their products were prior art and

23    had the capabilities that Katzer claimed as his invention several years later. As

Complaint and Demand for Jury Trial

1   noted later in this complaint, they also made Defendant Katzer and Defendant

2   Russell aware of other prior art which had similar capabilities, and were material

3   references for Katzer's patent applications. Although Defendant Katzer and

4   Defendant Russell had two patent applications open for prosecution on the merits,

5   neither made the patent examiner aware of the prior art identified by Dr. Tanner

6   and Mr. Freiwald.

7   26. Because of fraud on the Patent Office and inequitable conduct during the

8   prosecution of the '461 application, neither the patent issuing from the '461

9   application nor any patent (including the '329 patent) whose application claimed

10   benefit of its filing date is enforceable. Because of fraud on the Patent Office and

11   inequitable conduct during the prosecution of later applications, neither patents

12   issuing from the later applications nor any patent (including the '329 patent)

13   whose application claimed benefit of these applications' filing dates are

14   enforceable.

15   ii. JMRI PROJECT REFERENCE WITHHELD BY DEFENDANT KATZER DURING

16   PROSECUTION OF '878 APPLICATION

17   27. In late March 2002, a posting to a public mailing list described the client-server

18   capabilities of JMRI Project software to allow multiple programs to operate

19   multiple trains on a model railroad at the same time. On April 14, 2002, the first

20   version of JMRI Project software containing the new capabilities, was released to

21   the public for free download, and announced via several public mailing lists and

22   the JMRI Project website. Defendant Katzer is a member of the public mailing

23   list. Three days later, Defendant Katzer filed a patent application tailored to claim

Complaint and Demand for Jury Trial

1    the capabilities of the JMRI Project software. Defendant Katzer withheld

2    information about the JMRI Project software from the patent examiner. After a

3    patent issued from the patent application, Defendant Katzer, through his attorney

4    Defendant Russell, accused Plaintiff Jacobsen of infringing the patent, and sent

5    him a bill for more than $200,000.

6    28. Because of fraud on the Patent Office and inequitable conduct during the

7    prosecution of the '878 application, the '329 patent is unenforceable.

8    iii. DEFENDANT KATZER'S OWN REFERENCES WHICH HE WITHHELD

9    DURING PROSECUTION OF PATENT APPLICATIONS

10   29. Defendant Katzer first introduced a product called "Train Server" with the

11   NMRA programming API[2] in 1996. Defendant Katzer claims to have sent

12   approximately 100,000 Train Server CDs to users and developers, beginning in

13   1996. Defendant Katzer also created a product called "Train Tools" and first used

14   it in 1996. On information and belief, the "Train Tools" and "Train Server"

15   products are an embodiment of Defendant Katzer's API listed in '461 application.

16   Defendant Katzer intentionally did not list this in the Information Disclosure

17   Sheet. He intentionally withheld this reference from the patent examiner.

18   30. Defendant Katzer introduced "Engine Commander v.1.1" for the Marklin

19   command stations in January 1995. He advertised that it worked with LocoNet.

20   On information and belief, this reference is an embodiment of the invention

21   claimed in the '461 application. Thus this reference would have barred Defendant

---

[2] "API" is short for application programming interface. An API offers short-cuts to
software developers, so that they do not have to repeatedly re-create code to perform
certain functions.

1   Katzer from obtaining his U.S. patents under 35 U.S.C. § 102(b). Defendant

2   Katzer intentionally did not list this in the Information Disclosure Sheet. He

3   intentionally withheld this reference from the patent examiner.

4   31. In July 1996, Defendant Katzer advertised "Engine Commander v. 2.0". On

5   information and belief, this reference, alone or coupled with a server such as

6   Defendant Katzer's "Train Server", embodied the invention later claimed in the

7   '461 application. Thus this reference would have barred Defendant Katzer from

8   obtaining his U.S. patents under 35 U.S.C. § 102(b). Defendant Katzer

9   intentionally did not list this reference in the Information Disclosure Sheet. He

10   intentionally withheld it from the patent examiner.

11   32. In December 1997, Defendant Katzer advertised "Engine Commander with Train

12   Server v. 2.1". On information and belief, this product is an embodiment of the

13   invention claimed in the '461 application. Although not clearly barred by 35

14   U.S.C. § 102(b), Defendant Katzer had a duty to inform the patent examiner of

15   this advertisement. Instead, Defendant Katzer intentionally did not list it on the

16   Information Disclosure Sheet. He intentionally withheld this reference from the

17   patent examiner.

18   33. Because of fraud on the Patent Office and inequitable conduct during the

19   prosecution of the '461 application, neither the patent issuing from the '461

20   application nor any patent (including the '329 patent) whose application claimed

21   benefit of its filing date is enforceable. Because of fraud on the Patent Office and

22   inequitable conduct during the prosecution of later applications, neither patents

23   issuing from the later applications nor any patent (including the '329 patent)

Complaint and Demand for Jury Trial

1    whose application claimed benefit of these applications' filing dates are

2    enforceable.

3   C. DEFENDANT KATZER KNEW HE WAS NOT THE INVENTOR OF THE

4   INVENTIONS CLAIMED IN HIS PATENT APPLICATIONS

5    34. Defendant Katzer knew that others had invented some, if not all, of what he

6    claimed in the '461 application and later patent applications, but he lied and

7    claimed that he was the inventor.

8    35. For claims which had not been invented by others, Defendant Katzer knew that at

9    least one other person had worked jointly with him to invent what he claimed in

10    the patent applications, but he intentionally withheld the information from the

11    patent examiner.

12    36. Because of fraud on the Patent Office and inequitable conduct during the

13    prosecution of the '461 application, neither the patent issuing from the '461

14    application nor any patent (including the '329 patent) whose application claimed

15    benefit of its filing date is enforceable. Because of fraud on the Patent Office and

16    inequitable conduct during the prosecution of later applications, neither patents

17    issuing from the later applications nor any patent (including the '329 patent)

18    whose application claimed benefit of these applications' filing dates are

19    enforceable.

20   ///

21   ///

22   ///

23   ///

Complaint and Demand for Jury Trial

1  D. THE '329 PATENT AND OTHER PATENTS ISSUED TO KATZER ARE

2  INVALID ON VARIOUS PATENTABILITY GROUNDS

3     37. On information and belief, there are numerous other references, which alone or in

4        combination with still other references, anticipate or make obvious the invention

5        claimed in the '329 patent and other patents.

6     38. The '329 is invalid for failure to meet the written description requirement of 35

7        U.S.C. Sec. 112.

8  E. THERE ARE NO VALID ENFORCEABLE CLAIMS THAT CAN BE THE

9  SOURCE OF A PATENT INFRINGEMENT CLAIM BY DEFENDANT KATZER

10     39. Because of Defendant Katzer's and Defendant Russell's widespread inequitable

11        conduct, and fraud on the Patent Office, there are no enforceable claims that can

12        be the source of a patent infringement suit against Plaintiff Jacobsen or anyone

13        else in the U.S.

14     40. Numerous sources of prior art anticipate or make obvious the claims in the '329

15        patent and other patents issued to Katzer. The patent application also failed to

16        meet the written description requirements of 35 U.S.C. Sec. 112. Thus, there are

17        no valid claims that can be the source of a patent infringement suit against

18        Plaintiff Jacobsen or anyone else in the U.S.

19  F. DEFENDANTS ATTEMPTED TO MONOPOLIZE, AND ENGAGED IN OTHER

20  UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES

21     41. Because Defendants Katzer and Russell withheld material references and because

22        Defendants Katzer and Russell knew prior art either anticipated or made obvious

23        the inventions in the '329 patent, Defendants Katzer and Russell knew the '329

Complaint and Demand for Jury Trial

1    patent, and other patents issued to Katzer which he and Russell made veiled

2    threats to enforce, were not valid and enforceable.

3    42. Despite knowing that the patents were invalid and unenforceable, Defendants

4    embarked on a scheme to enforce them and collect patent royalties in violation of

5    federal antitrust laws and California unfair business practices laws. As a part of

6    the scheme, they filed or threaten to file patent infringement lawsuits,

7    cybersquatted on a JMRI Project trademark, repeatedly made false charges

8    against Plaintiff Jacobsen within industry working groups and on multiple public

9    forums, represented the patents were valid and enforceable, and used a FOIA

10    request to libel Plaintiff Jacobsen and intimidate him into shutting the JMRI

11    Project down.

12    i. ENFORCEMENT TACTICS THROUGH 2004

13    43. On Sept. 18, 2002, Defendant Russell filed patent infringement lawsuits in U.S.

14    District Court for the District of Oregon, on behalf of Defendant Katzer and

15    Defendant KAM against Dr. Hans Tanner of Digitoys and Juergen Freiwald of

16    Freiwald Software and certain distributors. The complaint against Dr. Tanner

17    alleged that Dr. Tanner's WinLok 1.5 and 2.0 infringed patents issued to Katzer.

18    The complaint against Mr. Freiwald alleged that Mr. Freiwald's Railroad & Co.

19    software infringed the patents issued to Katzer. Concurrent with filing the lawsuit,

20    Defendant Russell sent cease and desist letters to dealers who sold WinLok or

21    Railroad & Co. software.

22    44. On Oct. 3, 2002, Dr. Tanner wrote Defendant Russell regarding the patent

23    infringement complaint. Dr. Tanner reminded Defendant Russell that WinLok 1.5

Complaint and Demand for Jury Trial

1    and 2.0 had been released in 1993 and 1995, respectively. Thus, Dr. Tanner said,

2    Defendant Katzer's patent could not claim what would have been barred under 35

3    U.S.C. § 102(b). Dr. Tanner also pointed out that at least three other products had

4    the capabilities claimed later by patents issued to Katzer – Railroad & Co.'s

5    software, MES software created by Heinrich Maile of Spain, and SoftLok

6    software created by a German manufacturer. All three also would have served to

7    bar patents issued to Katzer under § 102(b). Citing Defendant Katzer's "failure …

8    to fully disclose the widely known and extant body of prior art", Dr. Tanner

9    accused Defendant Katzer of withholding references from the patent examiner, in

10   violation of Rule 1.56.

11   45. On Oct. 15, 2002, Mr. Freiwald wrote Defendant Russell regarding the patent

12       infringement complaint. Mr. Freiwald told Defendant Russell that his Railroad &

13       Co. software program had been sold since summer 1996. Like Dr. Tanner, Mr.

14       Freiwald pointed out that WinLok 1.5 and 2.0, the Spanish MES program, the

15       German SoftLok program pre-dated Defendant Katzer's patent application by

16       more than 1 year. Mr. Freiwald also noted that the German program MpC also

17       had capabilities claimed by the Katzer patent and was sold beginning in 1996.

18       Thus these would bar Defendant Katzer's patents. Then, Mr. Freiwald told

19       Defendant Russell: "Furthermore, it can be assumed that Katzer, as an expert in

20       the market of software for model railroad computer control, was aware of the

21       programs listed above when he filed his patents." Mr. Freiwald then accused

22       Defendant Katzer of withholding references, in violation of Rule 1.56.

Complaint and Demand for Jury Trial

46. On information and belief, Defendant Katzer and Defendant Russell discussed the letters from Dr. Tanner and Mr. Freiwald. Realizing that the patents they had worked together to obtain would be held unenforceable and/or invalid, they decided to dismiss the lawsuit.

47. Defendant Katzer's lawsuit against Dr. Tanner and Mr. Freiwald was dismissed on Dec. 20, 2002.

48. On information and belief, Defendant Katzer and Defendant Russell conspired to find other easier targets against which to enforce patents issued to Katzer. On information and belief, during 2003 and 2004, Defendant Katzer and Defendant Russell contacted several other hobbyists who offered software for controlling model trains. On information and belief, Defendant Katzer and Defendant Russell threatened them with patent infringement lawsuits and forced them to pay patent royalties. On such victim of these anticompetitive enforcement tactics was Glen Butcher who had offered free model railroad control system software called "loconetdd" and "railroadd" on his website. In September 2004, Mr. Butcher posted that he had been contacted by Defendant Katzer via e-mail. On information and belief, Defendant Katzer and/or Defendant Russell threatened Mr. Butcher with a patent infringement lawsuit and forced him to pay patent royalties. On information and belief, one or both defendants forced Mr. Butcher to take down his free software program. After Sept. 8, 2004, "loconetdd" and "railroadd" were no longer available for download.

49. Then, Defendants turned their attention to the JMRI Project.

Complaint and Demand for Jury Trial

ii. DEFENDANTS CONSPIRE AND PUT INTO EFFECT PLANS TO ATTACK THE
JMRI PROJECT AND PLAINTIFF JACOBSEN

50. On information and belief, in late 2004 and early 2005, Defendants conferred to
discuss the JMRI Project software, which allows for multi-train control through a
client-server system. JMRI has a following among model train enthusiasts who
use multi-train control systems. Defendant Katzer and Defendant Russell know
JMRI competes with Katzer's products. They set upon a plan to force the JMRI
Project to shut down or to pay royalties to Defendant KAM through various
harassing tactics. Defendant Katzer registered a domain name that is a JMRI
Project trademark, doing so in bad faith, with the intent to trade on its goodwill.
Defendant Katzer and employees of Defendant KAM decided to begin a
campaign within an NMRA industry working group and on multiple public
forums to falsely accuse Plaintiff Jacobsen of patent infringement and other bad
conduct, with the intent to weaken support for the JMRI Project. Despite knowing
that the '329 patent was invalid and unenforceable, Defendant Katzer and
Defendant Russell decided to threaten Plaintiff Jacobsen with patent infringement.
Defendant Katzer and Defendant KAM, through Defendant Russell, sent a FOIA
request to Plaintiff Jacobsen's employer, falsely accusing Plaintiff Jacobsen of
patent infringement, to embarrass Plaintiff Jacobsen and to make him look bad in
front of his employer. These acts have resulted in damages to Plaintiff Jacobsen
and injury to Defendant KAM's competitors, including the JMRI Project.

a. DEFENDANT KATZER CYBERSQUATS ON JMRI PROJECT TRADEMARK

51. DECODERPRO is a JMRI Project trademark for a JMRI product.

Complaint and Demand for Jury Trial

20

52. Defendant Katzer knew that the trademark DECODERPRO belonged to the JMRI Project.[3]

53. Defendant Katzer registered www.decoderpro.com with the intent to profit from the JMRI Project's goodwill in the trademark.

54. As a part a settlement agreement in a trademark infringement case filed against Jerry Britton in Oregon, Defendant Katzer transferred rights to www.decoderpro.com to Mr. Britton on the condition that Mr. Britton not transfer them to anyone else, including the rightful owner Plaintiff Jacobsen. In the settlement agreement, Defendant Katzer required Mr. Britton to pay him $20,000 if Mr. Britton transferred the domain name to anyone else.

55. Thus, Defendant Katzer continues to intend to profit in bad faith from the JMRI Project's goodwill.

b. DEFENDANT KATZER AND DEFENDANT KAM ENGAGE IN PUBLIC CAMPAIGN AGAINST PLAINTIFF JACOBSEN, FALSELY ACCUSING HIM OF PATENT INFRINGEMENT AND OTHER BAD ACTS

56. In late 2004 or early 2005, Defendant Katzer and employees of Defendant KAM began a campaign within a NMRA industry working group and on multiple public forums against Plaintiff Jacobsen. They spread accusations, which they knew were false, of patent infringement and other bad conduct about Plaintiff Jacobsen.

57. Defendants have waged this campaign for months. This campaign has hurt Plaintiff Jacobsen's reputation and Plaintiff Jacobsen has spent a significant amount of time to fight the campaign waged against him. Defendants committed

---

[3] On information and belief, Defendant Katzer has or is cybersquatting on others' trademarks.

Complaint and Demand for Jury Trial

1    these acts to intimidate Plaintiff Jacobsen, to force him to shut down KAM's

2    competitor, the JMRI Project, to pay royalties to Defendant KAM and to weaken

3    support for the JMRI Project.

4    c. ENFORCEMENT TACTICS AGAINST JMRI PROJECT

5    58. On or about March 8, 2005, Defendant Russell, acting upon Defendant Katzer's

6    instructions, sent Plaintiff Jacobsen a letter accusing Jacobsen of infringing Claim

7    1 of the '329 patent. In this letter, Defendant Russell stated that KAM had an

8    active licensing program, and wanted to license its patent to Plaintiff Jacobsen at

9    $19 per program installed on a computer. On information and belief, this license

10   was to be paid for past downloads and any future downloads. Knowing that Dr.

11   Tanner and Mr. Freiwald were sued in 2002, and knowing Defendant Katzer's

12   substantial wealth allowed him to sue him, Plaintiff Jacobsen was concerned that

13   he faced a patent infringement lawsuit. Plaintiff Jacobsen investigated Defendant

14   Russell's assertion, but concluded that he did not infringe.

15   59. Plaintiff Jacobsen responded to Defendant Russell's letter on March 29, 2005. He

16   asked for information on the preliminary analysis that Defendant Russell had

17   done and asked for Defendant Russell to show which JMRI modules infringed

18   Claim 1 of the '329 patent. Defendant Russell did not respond for several months.

19   60. On or about Aug. 24, 2005, Defendant Russell wrote back with essentially the

20   same response he provided in his March 8, 2005 letter. He also stated that he was

21   reviewing whether JMRI infringed any other patents issued to Defendant Katzer.

22   Defendant Russell included no detailed explanation of what JMRI modules

23   infringed any claim in any Katzer patent. Defendant Russell claimed the license

Complaint and Demand for Jury Trial

1     for Claim 1 of the '329 patent had risen $10 to $29 per license, and demanded

2     $203,000 for the 7,000 copies that Plaintiff Jacobsen had said, at the end of

3     summer 2005, had been distributed. On information and belief, the $29 license

4     was to be a license paid not only for past downloads, but for future downloads.

5     Defendant Russell enclosed a demand for payment and requested a response in 15

6     days.

7     61. On Oct. 20, 2005, Defendant Russell sent another letter to Plaintiff Jacobsen, with

8     an invoice that included finance charges. The new total was more than $206,000.

9     62. Defendant Russell has continued to send letters to Plaintiff Jacobsen on a roughly

10     monthly basis. Plaintiff Jacobsen responded on Jan. 31, 2006, stating that multiple

11     examples of prior art anticipated claims in the '329 patent and other patents

12     supposedly invented by Defendant Katzer, and that both Defendant Katzer and

13     Defendant Russell knew about them.

14     63. On or about Feb. 7, 2006, Defendant Russell responded, and continued to accuse

15     Plaintiff Jacobsen of infringing the '329 patent.

16   d. DEFENDANTS SEND A FOIA REQUEST TO PLAINTIFF JACOBSEN'S

17   EMPLOYER TO INTIMIDATE AND EMBARRASS PLAINTIFF JACOBSEN

18     64. On or about Oct. 27, 2005, Defendant Russell, on Defendant Katzer's and

19     Defendant KAM's behalf, filed a Freedom of Information Act request with the

20     U.S. Department of Energy ("DOE"), seeking e-mails and other communications

21     between Plaintiff Jacobsen and others regarding JMRI Project software. Plaintiff

22     Jacobsen's employer, the Lawrence Berkeley National Laboratory at the

Complaint and Demand for Jury Trial

1    University of California, has a contract with DOE, and Plaintiff Jacobsen had

2    used his DOE account on occasion to send messages to a public mailing list.

3    65. In the FOIA request, Defendant Russell falsely accused Plaintiff Jacobsen of

4    patent infringement, and claimed that the Lab had sponsored the allegedly

5    infringing JMRI Project's activities. This embarrassed Plaintiff Jacobsen in front

6    of his employer. Jacobsen had to explain Defendants' harassing conduct to his

7    employer and DOE. Defendant Russell made no exception for attorney-client

8    privileged e-mails between Plaintiff Jacobsen and any attorneys who Plaintiff

9    Jacobsen had sought legal advice from.

10    66. On information and belief, it was Defendants' intent to use the FOIA request to

11    embarrass Plaintiff Jacobsen and to intimidate him into shutting down the JMRI

12    Project and paying royalties to Defendant KAM.

13    67. On information and belief, DOE turned down Russell's FOIA request in late

14    December 2005.

15    G. DEFENDANTS' CONDUCT HAS RESULTED IN HARM TO JMRI PROJECT,

16    DEFENDANTS' COMPETITORS AND PLAINTIFF JACOBSEN, AND A NEED TO

17    RESOLVE THE DISPUTE

18    68. Defendants' intimidation tactics have harmed Plaintiff Jacobsen, the JMRI

19    Project, and other competitors.

20    69. Defendants' wrongful conduct succeeded in stopping Plaintiff Jacobsen from

21    posting an updated version of the JMRI Project software in late 2005, which one

22    manufacturer wanted to include in a CD due for release during the Christmas

23    holidays.

Complaint and Demand for Jury Trial

24

70. The increase in exchanges between Defendant Russell, done on behalf of Defendant Katzer and Defendant KAM, and Plaintiff Jacobsen, has left Jacobsen in reasonable and serious apprehension that Defendant Katzer and Defendant KAM will sue him, despite all parties knowing that the patents are invalid and unenforceable.

71. A test version of the latest JMRI Project software has been released, and a full version will be released shortly. These versions will have the same capabilities as the prior version, which Defendants maintain infringe the '329 patent. Plaintiff Jacobsen expects Defendants to repeat their accusations that the new version infringes the '329 patent.

72. Plaintiff Jacobsen seeks resolution of this matter, seeks to end Defendants' unlawful, unfair and/or fraudulent business practices, and wants redress for the harm that Defendants' have inflicted on him and others.

COUNT ONE

Declaratory Judgment of Unenforceability of the '329 patent

Against Defendant Katzer and Defendant KAM

73. Plaintiff Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 72.

74. Through their conduct, Defendant Katzer and Defendant KAM claim that the '329 patent is enforceable.

///

///

Complaint and Demand for Jury Trial

75. Plaintiff Jacobsen contends that the patent is unenforceable because of the fraud which Defendant Katzer and Defendant Russell committed on the Patent Office, and inequitable conduct.

76. By reason of paragraphs 73 through 75, an actual controversy exists between Plaintiff Jacobsen and Defendant Katzer and Defendant KAM as to the enforceability of the '329 patent. Plaintiff Jacobsen desires a judicial determination and declaration of respective rights and duties of the parties. Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

COUNT TWO

Declaratory Judgment of Invalidity of the '329 patent

Against Defendant Katzer and Defendant KAM

77. Plaintiff Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 72.

78. Through their conduct, Defendant Katzer and Defendant KAM claim the '329 patent is valid.

79. Plaintiff Jacobsen contends that many, if not all, enforceable claims in the '329 patent are invalid.

80. By reason of paragraphs 77 through 79, an actual controversy exists between Plaintiff Jacobsen and Defendant Katzer and Defendant KAM as to the validity of the '329 patent. Plaintiff Jacobsen desires a judicial determination and declaration of respective rights and duties of the parties. Such a determination is necessary

Complaint and Demand for Jury Trial

1    and appropriate at this time in order that the parties may ascertain their respective

2    rights and duties.

3

4                                   COUNT THREE

5                    Declaratory Judgment of Non-infringement

6                  Against Defendant Katzer and Defendant KAM

7    81. Plaintiff Jacobsen repeats and realleges each and every allegation in paragraphs 1

8        through 72.

9    82. Defendant Katzer and Defendant KAM claim products that Plaintiff Jacobsen

10       distributes, infringe the '329 patent.

11   83. Plaintiff Jacobsen contends that that he does not, and has not, infringed any valid

12       and enforceable claim of the '329 patent.

13   84. By reason of paragraphs 81 through 83, an actual controversy exists between

14       Plaintiff Jacobsen and Defendant Katzer and Defendant KAM as to the validity of

15       the '329 patent. Plaintiff Jacobsen desires a judicial determination and declaration

16       of respective rights and duties of the parties. Such a determination is necessary

17       and appropriate at this time in order that the parties may ascertain their respective

18       rights and duties.

19   ///

20   ///

21   ///

22   ///

23   ///

                                        Complaint and Demand for Jury Trial

1

COUNT IV

2

Antitrust violation under Sherman Act § 2

3

Against Defendant Katzer and Defendant KAM

4

(Relevant market: Multi-train control systems software; Geographic market: U.S.)

5    85. Plaintiff Jacobsen repeats and realleges each and every allegation in paragraphs 1

6        through 72.

7    86. For purposes of this claim, the relevant market is the market for multi-train

8        control systems software and the geographic market is the United States.

9    87. Defendant Katzer and Defendant KAM have market power. Defendant Katzer and

10       Defendant KAM boast on the KAM website that they are the predominant maker

11       of multi-train control systems software. They claim to have sold or otherwise

12       distributed more than 100,000 copies of control systems embodying inventions in

13       patents issued to Katzer. On information and belief, their sales exceed $100,000.

14       Furthermore, if valid and enforceable, the patents would dominate the relevant

15       market. They would cover many, if not most, multi-train control systems software

16       products made, used, sold and distributed in the United States.

17   88. The JMRI Project offers a competing product. It has been downloaded and used

18       by hobbyists approximately 12,000 times. It is distributed free so there are no

19       sales per se of the software, but donations to the project have been less than

20       $4,000 to date.

21   89. Defendants knowingly and willfully obtained the patents issued to Defendant

22       Katzer, through fraud on the Patent Office and through Defendant Katzer's and

23       Defendant Russell's inequitable conduct. The invention in the patents also is not

Complaint and Demand for Jury Trial

1    patentable because it is anticipated, obvious or invented by others. But for the

2    fraud on the patent office and inequitable conduct, the patents would not have

3    issued.

4    90. Defendant Katzer and Defendant KAM engaged in anticompetitive conduct. They

5    have embarked on a scheme, begun in 2002, to enforce these fraudulently

6    obtained and invalid patents, and have succeeded in removing or hindering

7    competitors through various anti-competitive enforcement tactics. In the litigation

8    against Dr. Tanner and Mr. Freiwald, the claim was so objectively baseless that

9    no reasonable litigant could have anticipated success. But regardless of the

10    outcome of the litigation, Defendant Katzer and Defendant KAM used the lawsuit

11    with the intent to interfere directly with Dr. Tanner and Mr. Freiwald's business.

12    They intend to interfere with the JMRI Project. Later on, and through the same

13    attorney, Defendant Russell, they have issued veiled threats that they will use

14    other patents issued to Defendant Katzer, to threaten Plaintiff Jacobsen, among

15    others, with patent infringement litigation.

16    91. Through this anticompetitive conduct, Defendant Katzer and Defendant KAM

17    specifically intended to gain a monopoly in the relevant market.

18    92. Because of Defendant Katzer's substantial wealth and willingness to enforce the

19    fraudulently obtained and invalid patents, there is a dangerous probability that

20    Defendant Katzer and Defendant KAM would succeed in obtaining monopoly

21    power.

22    ///

23    ///

Complaint and Demand for Jury Trial

93. Plaintiff Jacobsen has had to take time off work to address these threats and has lost income as a result of Defendant Katzer and Defendant KAM's unlawful conduct.

94. Defendant Katzer and Defendant KAM's unlawful conduct has caused damage to Plaintiff Jacobsen and, unless enjoined by this Court, continues to threaten to cause adverse and anticompetitive injury to Plaintiff Jacobsen and the JMRI Project.

COUNT V

UNFAIR COMPETITION UNDER SECTION 17200

Against All Defendants

95. Plaintiff Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 72.

96. Defendant Katzer and Defendant KAM have engaged in unlawful, unfair and/or fraudulent business acts and practices within the meaning of California Business and Professions Code § 17200 *et seq.* In particular:

   a. Defendant Katzer and Defendant KAM attempted to monopolize the multi-train control systems market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

   b. Defendant Katzer and Defendant KAM obtained the patents issued to Katzer through fraud on the Patent Office, and through inequitable conduct during patent prosecution.

Complaint and Demand for Jury Trial

c. Defendants have described their products as being covered by multiple patents, making it likely that they deceived others into thinking that the patents were valid and enforceable when the patents are not.

d. Defendant Katzer cybersquatted on a JMRI Project trademark. As a part of a settlement for trademark infringement, Defendant Katzer transferred the domain name to Jerry Britton with instructions that if Mr. Britton transferred the name to any other person, including the rightful owner Plaintiff Jacobsen, then Mr. Britton would have to pay Defendant Katzer $20,000. Defendant Russell drafted the agreement. On information and belief, Defendants are cybersquatting on others' trademarked names, with intent to profit in bad faith from the domain names.

e. Knowing the patents issued to Katzer were unenforceable because of fraud on the Patent Office and inequitable conduct during prosecution, and invalid because of prior art, Defendants Katzer and KAM, with Defendant Russell aiding and abetting, nevertheless began a pattern of enforcing the patents issued to Katzer as if they were enforceable and valid.

f. Defendant Katzer and employees of Defendant KAM conspired and have engaged in a campaign within an NMRA industry working group and on multiple public forums to falsely accuse Plaintiff Jacobsen of patent infringement and other bad conduct. They committed these acts with the intent to weaken support for the KAM's competitor, the JMRI Project, to intimidate Plaintiff Jacobsen into shutting down the JMRI Project and to force Plaintiff Jacobsen to pay royalties to Defendant KAM.

Complaint and Demand for Jury Trial

g. Defendants conspired to send a FOIA request to Plaintiff Jacobsen's employer to embarrass him and to intimidate him into shutting down the JMRI Project and to pay royalties to Defendant KAM.

h. Plaintiff Jacobsen had to divert significant work time from other projects to deal with the false accusations and the FOIA request, resulting in a loss of income.

i. Defendant Katzer and Defendant KAM's unlawful enforcement tactics has resulted in, or threaten, anticompetitive injury to competitors, such as Plaintiff Jacobsen and the JMRI Project.

97. Plaintiff Jacobsen, other competitors, and other model train hobbyists, will continue to suffer injury in fact, and the loss of money and property, as a result of Defendants' unfair competition.

COUNT VI

CYBERSQUATTING IN VIOLATION OF 15 U.S.C. § 1125(d)

Against Defendant Katzer

98. Plaintiff Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 72.

99. Plaintiff Jacobsen and the JMRI Project are the owners of the trademark DECODERPRO.

100.     On information and belief, Defendant Katzer knew that DECODERPRO is a JMRI Project trademark.

Complaint and Demand for Jury Trial

32

101.   On information and belief, Defendant Katzer registered the domain name

www.decoderpro.com, in violation of Section 43 of the Lanham Act, 15 U.S.C. §

1125(d).

102.   Plaintiff Jacobsen had rights to the trademark DECODERPRO before

Defendant Katzer registered the name.

103.   Defendant Katzer trafficked in the domain name when he transferred it to

Jerry Britton and held on to rights in the domain name by threatening to force Mr.

Britton to pay $20,000 if Mr. Britton transferred the domain name to another

person, including the rightful owner, Plaintiff Jacobsen.

104.   Thus, Defendant Katzer intends to profit in bad faith from the goodwill of

Plaintiff Jacobsen's mark.

105.   Unless Defendant Katzer is enjoined in its wrongful conduct, Plaintiff

Jacobsen will suffer irreparable injury and harm for which there is no adequate

remedy at law.

## COUNT VII

## LIBEL

### Against all Defendants

106.   Plaintiff Jacobsen repeats and realleges each and every allegation in

paragraphs 1 through 72.

107.   On information and belief, Defendant Katzer and Defendant KAM

directed Defendant Russell to make a FOIA request to DOE, falsely accusing

Complaint and Demand for Jury Trial

1    Plaintiff Jacobsen of patent infringement and seeking documents relating to the

2    JMRI Project.

3    108.    Defendant Russell drafted a FOIA request on or about Oct. 27, 2005 to the

4    U.S. Department of Energy, stating that the JMRI Project was infringing KAM's

5    patents. Defendant Russell alleged that the Lab and DOE were involved in and/or

6    funding the JMRI Project.

7    109.    On or about Oct. 27, 2005, Defendant Russell sent the FOIA request to

8    DOE.

9    110.    At the time he sent the FOIA request, Defendant Russell was aware that

10    the patents were fraudulently obtained and prior art, including the JMRI Project's

11    software, anticipated or made obvious the '329 patent. Thus Defendant Russell,

12    aware that the patents are unenforceable and invalid, knowingly made a false

13    accusation of patent infringement against Plaintiff Jacobsen, a scientist whose

14    work involves the creation of intellectual property.

15    111.    On information and belief, Defendant Russell knew that the Lab and DOE

16    had nothing to do with the JMRI Project, but made the allegation to effect

17    Defendants' goal to embarrass Plaintiff Jacobsen and force him to shut down the

18    JMRI Project and to pay royalties to Defendant KAM.

19    112.    DOE received the FOIA request and made inquiries with the Lab. The Lab

20    then asked Plaintiff Jacobsen about the FOIA request.

21    113.    This false accusation embarrassed and worried Plaintiff Jacobsen, causing

22    him to have to explain Defendants' harassing conduct to his employer, the Lab,

23    and to the U.S. Department of Energy. The false accusation injured Plaintiff

Complaint and Demand for Jury Trial

1   Jacobsen's reputation, and caused him to divert significant work time from other

2   projects to deal with the FOIA request, resulting in a loss of income.

3

4   PRAYER FOR RELIEF

5   WHEREFORE, Plaintiff Jacobsen respectfully requests that the Court enter

6   A.  A declaration that Jacobsen has not and does not infringe any valid and

7        enforceable claim of the '329 patent.

8   B.  A declaration that the '329 patent is invalid.

9   C.  A declaration that the '329 patent is unenforceable because of fraud on the Patent

10       Office during the prosecution of the '461 application.

11  D.  A declaration that the '329 patent is unenforceable because of inequitable conduct

12       during the prosecution of the '461 application.

13  E.  A declaration that the '329 patent is unenforceable because of fraud on the Patent

14       Office during the prosecution of the '878 application.

15  F.  A declaration that the '329 patent is unenforceable because of inequitable conduct

16       during the prosecution of the '878 application.

17  G.  An injunction prohibiting Defendants, their officers, agents, employees, assigns,

18       attorneys, parents, subsidiaries or other persons in active concert or participation

19       with Defendants from asserting any claim of the '329 patent against any other

20       person in the United States.

21  H.  For patents owned by Defendant Katzer or Defendant KAM that remain

22       enforceable, an injunction ordering Defendant Katzer to identify all patents and

23       patents applications filed in the United States and throughout the world, to

Complaint and Demand for Jury Trial

1    produce to their respective patent offices all material references discovered

2    through this litigation, and to request re-examination (or the nearest equivalent

3    proceeding outside the U.S.) of any patents issuing from the patent applications.

4    I.  A decree finding that Defendant Katzer and Defendant KAM have attempted to

5    monopolize the market for multi-train control systems software in the United

6    States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7    J.  An award for treble damages for the loss of income and other property as a result

8    of Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

9    K.  A decree finding that any patents used to effect Defendant Katzer and Defendant

10    KAM's anticompetitive scheme are unenforceable.

11    L.  A decree finding that Defendant Katzer and Defendant KAM have engaged in

12    unlawful, unfair and/or fraudulent business practices in violation of the California

13    Unfair Competition Act, California Business and Professions Code § 17200 *et*

14    *seq.*

15    M.  An order finding that Defendant Katzer has cybersquatted on the trademarked

16    name, www.decoderpro.com, owned by Plaintiff Jacobsen in violation of the

17    Lanham Act, 15 U.S.C. § 1125(d), and requiring Defendant Katzer to release any

18    rights he has in said domain name and return said domain name to Plaintiff

19    Jacobsen.

20    N.  An order enjoining Defendant Katzer and Defendant KAM, and all persons and

21    entities under their direction or control, from engaging in or carrying out any

22    further anti-competitive or bad faith conduct in violation of the Sherman Act, and

23    the Lanham Act.

Complaint and Demand for Jury Trial

1    O.  An order enjoining all Defendants, and all persons and entities under their

2        direction or control, from engaging in or carrying out any further unlawful, unfair

3        or fraudulent business practices in violation of the California Unfair Competition

4        Act.

5    P.  An order referring the matter to the appropriate U.S. Attorney's Office for

6        investigation into antitrust violations, perjury, mail fraud, and cancellation

7        proceedings against any patents involved in this litigation, and any related patents.

8    Q.  An award of $50,000 in damages from Defendants, jointly and severally, for libel.

9    R.  Punitive damages for libel from Defendants, jointly and severally, in an amount

10       that the jury find appropriate.

11   S.  An order awarding costs and attorney's fees as permitted by law, including 35

12       U.S.C. § 285.

13   T.  An order granting any other relief the court finds just.

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

Complaint and Demand for Jury Trial

1 | DISCLOSURE OF INTERESTED PARTIES OR ENTITIES PURSUANT CIVIL

2 | LOCAL RULE 3-16

3 |       Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other

4 | than the named parties, there is no such interest to report.

5

6 | Dated: *March 13, 2006*

              VICTORIA K. HALL

7 |               LAW OFFICE OF VICTORIA K. HALL

8

9 |       Signed: *Victoria K. Hall*

10 |                     Attorney for

11 |                   Plaintiff Jacobsen

12 |               JURY DEMAND

13 |    Plaintiff respectfully requests a jury trial for all issues triable by jury.

14

15 |               LAW OFFICE OF VICTORIA K. HALL

16

17 |       Signed: *Victoria K. Hall*

18 |                     Attorney for

19 |                   Plaintiff Jacobsen

20

21

22

23

                               Complaint and Demand for Jury Trial