1
VICTORIA K. HALL (SBN 240702)
LAW OFFICE OF VICTORIA K. HALL
2
401 N. Washington St. Suite 550
Rockville MD 20850
3
Victoria@vkhall-law.com
Telephone: 301-738-7677
4
Facsimile: 240-536-9142

5
Attorney for Plaintiff
ROBERT JACOBSEN

6

7

8

9

10                    UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                       SAN FRANCISCO DIVISION

13  ROBERT JACOBSEN,                    )  No. C-06-1905-JSW
                                        )
14                          Plaintiff,  )  **AMENDED COMPLAINT FOR**
                                        )  **DECLARATORY JUDGMENT,**
15        v.                            )  **VIOLATIONS OF COPYRIGHT AND**
                                        )  **FEDERAL TRADEMARK LAWS,**
16  MATTHEW KATZER, et al.,             )  **UNFAIR COMPETITION, AND UNJUST**
                                        )  **ENRICHMENT**
17                         Defendants.  )
                                        )  Courtroom:    2, 17th Floor
18                                      )  Judge:        Hon. Jeffrey S. White
                                        )
19                                      )
                                        )
20  _____)

21  Plaintiff, Robert Jacobsen, alleges as follows:

22  I. NATURE OF ACTION

23      1.  Defendant Matthew Katzer has stolen a fledgling open source software group's intellectual

24          property for his own and his company, Defendant KAMIND Associates, Inc.'s, economic

25          gain.  This lawsuit seeks to stop him.

26      2.  In 2000, Robert Jacobsen and other software developers founded the Java Model Railroad

27

28

Interface (JMRI) Project[1] . The JMRI Project relies on the voluntary contributions of its members to produce software used by model train hobbyists.  In return for the efforts of its members, the JMRI Project licenses its software to the general public under an open source license.  Common to open source licenses are covenants requiring free distribution/redistribution of the software, that the source code be provided along with the actual object code or executable file, and that any derivative work also be licensed as an open source licensed product.[2]

3.  Open source software is relatively new but of increasing importance to the public, business community and the government.  Some better known open source licensed software includes Apache Web Server[3], Mozilla[4] and Linux.[5]  Some lesser known, but equally important, open source projects include Samba[6] and MySQL.[7]  The impact that these various open source projects have had on the software industry as a whole cannot be overstated.  The Apache Web Server application runs approximately 60 percent of the web servers on the Internet[8] and Linux is projected to have a market value of $35 billion by 2008.[9]

4.  Common to all these various open projects, is that each started out small, and grew through the contributed time, effort, and labor or various software developers.  As an example, the Linux operating system began as a hobby project undertaken by Linus Torvolds.[10] Torvolds wrote the first version of the Linux operating system and posited it to an online news group for comment and review.  Software developers reviewed his code, comments on it, and through this review the Linux operating system grew more sophisticated, and

---

[1]  JMRI Project, at http://jmri.sourceforge.net/apps (last visted Sept. 10, 2006)
[2] Open Source Initiative definition, at http://www.opensource.org/docs/definition.php (last visited Sept. 10, 2006).
[3]  Apache project, at http://www.apache.org (last visited Sept. 10, 2006)
[4]  Mozilla project, at http://www.mozilla.org (last visited Sept. 10, 2006)
[5]  Linux project, at http://linux.org (last visited Sept. 10, 2006)
[6]  Samba project, at http://us3.samba.org/samba (last visited Sept. 10, 2006)
[7]  MySQL project, at http://www.mysql.com (last visited Sept. 10, 2006)
[8]  Apache project at success at http://news.netcraft.com/archives/web_server_survey.html (last visited Sept. 10, 2006)
[9] Corporate Overview March 2005, at http://www.osdl.org/docs/corporate_overview_march_2005.ppt#31 (last visited September 10, 2006)
[10]  Linux kernel description, at http://en.wikipedia.org/wiki/Linux_kernel (last visited Sept. 10, 2006)

1    robust to the point where now today Linux is an enterprise-grade operating system running

2    everything from cell phones to super computers.

3    5.   Currently, various internet websites such as SourceForge[11] and Freshmeat[12] host open

4         source projects.   Thousands of open source software projects exist.   SourceForge, for

5         example, hosts more than 100,000 projects. Projects often start up as informal groups of

6         software developers who create code to meet a specific need.   Developers work on the

7         project because they enjoy it. These Internet websites not only host these various open

8         source projects, but in effect serve as incubators for various open source technology and the

9         intellectual property associated with these projects.   The projects on these websites generate

10        large amounts of copyrighted materials in the form of source code, trademarks used to

11        associate the goodwill of the project and its products with a mark, and other types of

12        intellectual property.   Copyrighted source code is typically licensed under an Open Source

13        license such as the MIT Artistic License or GPLv2.

14   6.   Open source software exists side by side with proprietary software, whose code is kept

15        secret from the public.   An important aspect of open source software, and its associated

16        licensing scheme, from other software and their associated licensing schemes, is

17        reciprocity.[13] Here, Defendant Mathew Katzer ("Katzer") has taken valuable intellectual

18        property from the JMRI project for his own and his company's economic gain, and has not

19        only contributed nothing in return, but sought to attack members of the JMRI project.   As

20        with many informal groups, JMRI Project developers neither initially registered copyrights

21        nor trademarked their projects or product names, nor filed patent applications for inventions

22        they created.   Nor did they incorporate as businesses.   Some projects do later become

23        corporations and run businesses, and thus have typical legal protections available to them.

24        But what of the fledgling open source projects, like the JMRI Project, and their individual

25        software developers, that create valuable intellectual property which is later stolen and used

26

27   _____
     [11]  SourceForge.net, at http:sourceforge.net (last visited Sept. 10, 2006)
     [12] Freshmeat, at http:freshmeat.net (last visited Sept. 10, 2006)
28   [13] Martin Frink, The Business and Economics of Linux and Open Source 39 (2003).

by others for their own profit?  Or worse, patented and used against the very members of the open source project who created it?  This case is about the legal protections – intellectual property, antitrust[14] and unfair competition – that are available to open source software projects in their infancy, and the individual developers who comprise these projects.

## II. THE PARTIES

7.  Robert Jacobsen ("Jacobsen") is an individual living in Berkeley, California. He works for the University of California, Berkeley and the Lawrence Berkeley National Laboratory ("Lab") of the University of California.  He teaches physics at the university.  He is a model train hobbyist who has written, with others, open source software code called JMRI (Java Model Railroad Interface) which allows him and other model train hobbyists to control hardware on model train layouts.  Jacobsen, a primary developer and distributor of the software through the JMRI Project, makes this software available on the Internet, free of charge, but allows hobbyists to donate to support the project. His experience with model train control systems is such that he is an expert in the field.

8.  Matthew Katzer ("Katzer") is an individual living in Oregon. He is also a model train hobbyist who has written software code for controlling model train hardware on a layout. He has obtained several utility patents, including one or more in which he captured JMRI intellectual property, and has several patent applications pending at the time this amended complaint is filed.  His experience with model train control systems is such that he is also an expert in the field.

9.  KAMIND Associates, Inc. ("KAM") is an Oregon corporation with its principal place of business at Hillsboro, Oregon. It does business as KAM Industries. On information and

---

[14] The antitrust claim in the original Complaint has been removed. Plaintiff reserves the right to seek its reinstatement

belief, KAM is owned by Katzer and another person, Barbara Dawson. On information and belief, KAM is in the business of selling products embodying methods which Katzer said were his inventions, and which Katzer claimed in the patents issued to him. KAM's products range in list price from $49 to $249.

III. JURISDICTION AND VENUE

10. This action arises under patent laws of the United States (35 U.S.C. §§ 1 *et seq.*), the Lanham Act (15 U.S.C. §§ 1051 *et seq.*), California's Unfair Competition Act (California Business & Professions Code §§ 17200 *et seq.*), copyright laws of the United States (17 U.S.C. §§ 1 *et seq.*) and laws authorizing declaratory judgment actions (28 U.S.C. §§ 2201-2202). Because of a series of demand letters, bills and a FOIA request directed at Jacobsen's employer, Defendants' conduct has put Jacobsen in reasonable and serious apprehension of imminent suit for infringement of the '329 patent. Based on the allegations in Paragraphs 15 through 69, there is a conflict of asserted rights between Jacobsen and Defendants Katzer and KAM, and thus an actual controversy exists between Jacobsen and Defendants Katzer and KAM as to the validity, scope, enforceability and infringement of the '329 patent. Defendants' conduct has violated federal copyright and trademark laws, and the California Unfair Competition Act. They have also unjustly enriched themselves by infringing JMRI and Jacobsen's intellectual property.

11. This Court has personal jurisdiction over the defendants. Jacobsen is the main contact for the JMRI Project. Katzer has repeatedly directed charges of infringement against Jacobsen, and interfered with his employment. He has also cybersquatted on a JMRI Project trademark, diluted JMRI trademarks, and used copyrighted JMRI Project code as his own in violation of the software license. Defendants committed various acts in an attempt to force

upon reviewing the Court's pending written ruling.

No. C-06-1905-JSW   AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, VIOLATIONS OF COPYRIGHT AND FEDERAL TRADEMARK LAWS, UNFAIR COMPETITION AND UNJUST ENRICHMENT

Jacobsen to shutdown his software or force him to pay Katzer and KAM royalties on Katzer's fraudulently obtained and invalid patents. Thus, Defendants' conduct resulted in apprehension of suit and injury in this jurisdiction.

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202, and supplemental jurisdiction, 28 U.S.C. § 1367.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).

## IV. INTRADISTRICT ASSIGNMENT

14. This case is exempt from Local Rule 3-2 because it is an intellectual property matter. It has been assigned to the San Francisco division.

## V. FACTS

The JMRI Project

15. In 2000, Plaintiff Robert Jacobsen returned to an old hobby from his teen years – model trains. Shortly afterward, Jacobsen teamed with model train hobbyists to create the JMRI (Java Model Railroad Interface) Project on SourceForge.net, an incubator site which hosts more than 100,000 open source software projects. As the group's membership changed, Jacobsen found himself taking on more responsibilities, until he became one of the leaders of the group. He currently serves as the main contact for The JMRI Project. The JMRI Project produces software to run trains, switches and other items on a layout. The software installs on one computer, and runs model train hardware from that computer.

16. Hobbyists have several ways to control trains and other equipment on a layout. One is Digital Command Control (DCC), a standard developed by the DCC Working Group of the National Model Railroad Association (NMRA). DCC and similar systems control trains, rail switches and other items on a layout, via computer chips (called decoders) embedded in the hardware. Numerous model train equipment manufacturers offer products for use in train control systems, including hardware and software. Because of the differences between

products, software used to control the trains must be tailored to permit hobbyists to change settings for these items.  JMRI Project software meets this need, including what are called "decoder definition files" which allow the software to be used with a wide range of model train hardware.  These definitions are stored for computational purposes in computer files. The JMRI developers as a group have produced definitions for more than 350 types of decoders. These definitions are stored in more than 100 files.  Furthermore, because of the flexibility of the Java programming language, hobbyists may use JMRI Project software on various computer platforms, including Mac, Windows and Linux operating systems.  The JMRI Project recently won a prestigious award from Sun Microsystems for its innovative use of the Java programming language.[15]

17. Jacobsen is a popular among hobbyists, and most manufacturers.  As he became more deeply involved in model trains, he joined the National Model Railroad Association, became a member of the Digital Command Control (DCC) Working Group, and then Chair of that standards-setting group.  As the main contact for The JMRI Project, he has helped numerous model train hobbyists with setting up their software and layouts.  Within a mere 5 years, as more hobbyists and manufacturers sought Jacobsen for help, Jacobsen became a leader in the model train community.  People liked him and gave him the recognition due to him.  Like other manufacturers and hobbyists, Jacobsen succeeded where Katzer had not, and that made Katzer mad.

Matthew Katzer and KAMIND Associates, Inc.

18. On information and belief, Defendant Matthew Katzer became involved in the National Model Railroad Association in the late 1980s or early 1990s.  Once there, he joined the DCC Working Group, a select group of manufacturers and expert model train hobbyists, who work together to develop written guidelines for the industry.  Manufacturers and other producers of hardware and software use these standards so that their products will interface seamlessly with other products.  Model train hobbyists use these software and hardware

---

[15]   Sun   Microsystems,   2006   JavaOne   Conference,   Duke's   Choice   Awards,   at http://java.sun.com/javaone/sf/dukes_choice_awards.jsp (last visited Sept. 11, 2006).

products to simulate – with great detail – the operation of life-size trains from a given time frame and location, such as Northern California rail lines along the Pacific Coast during the 1950s.

19. Katzer boasted that he had software that would control model trains so they would operate like life-size trains.  When other manufacturers took out small black-and-white ads in hobbyist magazines, Katzer took out full-page color ads in Model Railroading magazine for his products.  But he failed – repeatedly – to produce a software product that would work seamlessly with model train hardware.  As others, such as Freiwald software and DigiToys Systems, succeeded, Katzer and his company languished.  Envious of others, Katzer took the inventions in the products of others and patented them as his own.

Katzer learns what others have invented for model train control

20. Real railroads (also called prototype railroads) have used the technology claimed by Katzer in his patents since the 1930s.  Katzer knew about this technology because expert hobbyists seek to replicate prototype railroad trains in their model train layouts, and thus seek to re-create prototype railroad train control systems.

21. Marklin, Inc. of Germany introduced a system in 1986 that permitted model train control called "Command Control", consisting of a command center which received controls from outside sources (such as a computer or a hand-held controller device), and directed the control signal to a designated train. This system was in public use, advertised and sold beginning in either the late 1980s or early 1990s. Katzer was aware of Marklin's work. On information and belief, Katzer worked with Marklin in the late 1980s and early 1990s.

22. In 1993, Dr. Hans Tanner of DigiToys released WinLok 1.5, a software program which allowed model train control. In 1995, Dr. Tanner released WinLok 2.0 which incorporated other advances in train control. The WinLok programs are known to model train enthusiasts, and were reviewed in Model Railroading magazine in March 1995 (WinLok 1.5) and December 1995 (WinLok 2.0). The programs compete with KAM's products.

-8-

Through the DCC Working Group, Katzer knew Dr. Tanner, his company and his products. In his patent applications, Katzer referred to software published by DigiToys, but he intentionally did not identify it on the Information Disclosure Sheet nor did he provide a copy of it or its manual to the patent examiner. The only DigiToys software programs that Katzer could have been referring to is the WinLok series.

23. A. J. Ireland, of Digitrax, developed a DCC system called "Challenger" in 1993 and introduced it at the NMRA National Convention in Valley Forge, PA. Mr. Ireland later introduced another DCC system called "Big Boy", which he sold through his company beginning in September 1994. "Big Boy" used technology similar to a simple computer network to interconnect parts of the model railroad system – one or more throttles (hand-held computer devices) used to control individual trains, personal computers to control individual trains, and a command station to route control signals to one or more trains. This system is called "LocoNet". This system and the Digitrax products operate with KAM's products. Katzer requested and received the LocoNet specification in 1994 or 1995. Mr. Ireland then developed the "Chief" DCC, which embodies advances over "Big Boy". Ireland sold "Chief" through Digitrax beginning in 1996.  As a member of the DCC Working Group, Katzer knew Ireland and was aware of Digitrax' products and LocoNet.

24. In 1993, Train Track Computer Systems introduced "Track Driver Professional 32" ("TD Pro"), software for prototype (that is, life-size) railroads that contains the client-server features which Katzer claimed years later in Katzer's first patent application. On information and belief, Katzer worked with Train Track Computer Systems prior to filing his first patent application, thus he knew about TD Pro's capabilities when he filed.

25. Beginning in 1994, at conferences in the United States and Europe, LocoNet technology was publicly used to demonstrate model train control through a network. Conference

-9-

organizers published notices and advertisements of such demonstrations. On information and belief, Katzer was aware of this information.

26. Strad Bushby of Silver Spring, MD, used the Digitrax products starting in 1995 to build a system involving multiple interconnected computers for running trains on a model railroad. His activities were advertised in programs at area model railroad conventions beginning in 1996, and tour buses of model railroad enthusiasts came to his home to see his control systems set-up. Mr. Bushby discussed his model train control systems with Katzer before Katzer filed his patent applications.

27. In May 1996, John E. Kabat created software, called LOCONET1 v. 1.2, which could interface with the LocoNet network, thus allowing other programs to send commands, one program at a time, to trains through LocoNet. By early February 1997, Kabat had created a more advanced version of his program, called LOCONET.VxD, which worked in MICROSOFT Windows systems. This version of the software, offered to the public for free via download, allowed multiple programs to communicate with the LocoNet system, and queue commands to be sent to their corresponding trains. Katzer had multiple conversations with Kabat about these software programs. Katzer included discussions of Kabat's programs in his own presentations at the NMRA conventions in 1996, 1997 and 1998.

28. Mr. Juergen Freiwald of Egmating, Germany wrote and sold software under the names "Railroad and Co." and "TrainController". This software competes with KAM's products. Versions made publicly available in 1995 could control trains via multiple control systems. Katzer knew of these programs, and included information about them in his presentations at the NMRA conventions in 1997 and 1998.

29. During 1997, Stanley Ames, Rutger Friberg and Edward Loizeaux wrote a book called "Digital Command Control - the comprehensive guide to DCC" which described various

-10-

control system aspects later claimed in Katzer's patent applications.  Katzer contributed to this book, and signed its introduction as an explicit endorsement of its contents. KAM has offered the book for sale.

30. At the DCC Working Group meeting at the NMRA National Convention in late July or early August 1997, Dr. Tanner of Digitoys gave a presentation on Railroad Open System Architecture (ROSA), which described model train control using a network. Dr. Tanner used several slides to describe ROSA. Katzer was a member of the DCC Working Group at the time, and attended the presentation.

<u>Katzer, through his attorney Russell, files patent applications covering the prior art</u>

31. Katzer filed numerous applications for patents on model train control systems, beginning with patent application 09/104,461 ("the '461 application"), filed on June 24, 1998, which matured into U.S. Patent No. 6,065,406 ("the '406 patent").

32. From the '461 application stemmed several continuation applications, from which issued a number of other patents, including the '329 patent.[16]

33. Although aware of others' control systems, some of which have been identified in paragraphs 20-30, Katzer and his attorney Kevin Russell intentionally did not list the information on the Information Disclosure Sheet. They intentionally withheld the information from the patent examiner and claimed a model train control system that been published, in public use, offered for sale and sold years before.

34. Katzer and his attorney Russell also intentionally withheld information about KAM's products, which include model train control systems that were in public use, published,

---

[16] The '329 patent issued from patent application 10/124,878 ("the '878 application"), which was filed April 17, 2002 and claimed benefit of the filing date of patent application 09/858,222. This patent application, in turn, claimed benefit of the filing date of patent application 09/550,904, which claimed benefit of the filing date of the '461 application.  A chart of Katzer's U.S. patent applications and their corresponding patents is attached at Exhibit A.  The '329 patent is Exhibit B.

offered for sale or sold in the U.S. more than 1 year before Katzer filed the '461

application. According to Katzer's trademark registrations, filed by Katzer's attorney

Russell, at least two products – Train Server and Engine Commander – were used in

commerce on or before June 1997.  Katzer advertised these products for sale in Model

Railroading in 1995 through January 1997 and on his website during the same time frame.

According to the copyrights on various KAM products, KAM software embodying the

patented methods was first published in 1992.  None of this information was made available

to the patent examiner.

35. Furthermore, Katzer claimed he was the sole inventor, while knowing that he was not.

36. Because Katzer and his attorney Kevin Russell withheld this information from the patent

examiner, they committed inequitable conduct.[17]

---

[17] In earlier filings in this Court [Dkts 61, 62, 65], Mr. Russell argued that because the U.S. Patent Office reviewed the Complaint and did not cancel any claims, that therefore, the Complaint is without merit and no inequitable conduct occurred.  First, the Complaint is not meant to be an enabling printed publication to be used by a person having ordinary skill in the art to make the invention, but a pleading drafted to meet the Federal Rules of Civil Procedure. Thus, it makes sense that it would not be prior art.  Second, the statement regarding the patent examiner's finding re inequitable conduct, made by a registered patent attorney, is wholly contrary to U.S. Patent Office procedures.  The Manual for Patent Examination Procedure (MPEP) states that the Patent Office cannot make any determination regarding inequitable conduct.  "[T]he Office does not investigate and reject original or reissue applications under 37 CFR 1.56. Likewise, the Office will not comment upon duty of disclosure issues which are brought to the attention of the Office in original or reissue applications except to note in the application, in appropriate circumstances, that such issues are no longer considered by the Office during its examination of patent applications." MPEP 2010 (8th ed. 4th rev. 2005).

Furthermore, Katzer and his attorney Russell began in May 2006 to submit all prior art identified by Jacobsen and others in their anti-SLAPP declarations, in various Information Disclosure Sheets.  For three pending patent applications, 10/889,995, 10/976,227 and 10/989,815, these filings amount to between 150-200 references, totaling approximately 5,000 pages for each application. Correspondence between the Patent Office and Katzer and Russell regarding these applications can be viewed via the U.S. Patent & Trademark Office website, at http://www.uspto.gov.  Select "Patents" on the left side of the website, select "View in PAIR", and scroll to the middle of the screen that appears and select "Public PAIR" which is in the View section. Enter any one of the three patent application numbers listed above on the screen that appears.  When the website opens to the patent application, select Transaction History or Image File Wrapper tabs to view the correspondence.  In the

-12-

Katzer and Jacobsen's first contact

37. In 2000, Jacobsen returned to a hobby from his teens – model trains. He joined other model train hobbyists and became a member of the NMRA. A software developer by training, Jacobsen was interested in writing his own code to control trains. He had heard about Katzer through others, and contacted him to talk about model trains. Katzer tried to sell Jacobsen his software, but Jacobsen declined to buy it and said he planned on writing his own. Katzer reacted negatively, and Jacobsen ended the email exchange. They emailed again in 2001, with the same result. Jacobsen instead joined the JMRI Project.

38. Jacobsen then joined the NMRA DCC Working Group, and became acquainted with manufacturers such as A.J. Ireland, Hans Tanner and Juergen Freiwald, and expert hobbyists such as Strad Bushby and others. He also got to know Katzer. They exchanged emails repeatedly through Jacobsen's email address, Bob_Jacobsen@lbl.gov, which Jacobsen used due to the long hours he puts in at the university. As Jacobsen rose to the top of the working group leadership, Jacobsen quickly received the recognition that Katzer had sought for years.

The JMRI Project thrives, and Katzer steals its Intellectual Property

39. Begun in 2000, the JMRI Project offers open source Java code which is used to control

10/889,995 application, the patent examiner responded to Russell and Katzer's argument that "In some cases, the first program, the second program, and the resident external controlling interface may be operational on the same general purpose computer." This is how JMRI Project software works and what Russell claimed in his anti-SLAPP declaration as the basis for his <u>reasonable</u> belief that JMRI Project software infringed the '329 patent. In rejecting all claims, the examiner stated: "[T]his is clearly unpatentable because [the claims] are suggested by the submitted IDS documents <u>to control an electrical circuit</u> (this is essentially what the applicant claims)." Miscellaneous Action with SSP, dated Aug. 7, 2006, Patent Application No. 10/889,995, U.S. Patent & Trademark Office. In the 10/976,227 application, the patent examiner – upon receipt of such a massive amount of references – refused to consider the references. "[T]he filing of huge disclosures, wherein, certain documents contain more than a thousand pages, is similar to offering a needle in a haystack. In the case of extraordinary circumstances, such as this, it is deemed reasonable to request the Applicant to fulfill his duty to disclose [under Rule 56] by explaining or disclosing the specific material that is material to the patentability of the instant claimed invention…." Miscellaneous Action with SSP, dated July 10, 2006, Patent Application No. 10/976,227, U.S. Patent & Trademark Office. This is the <u>same</u> examiner – Mark Le – whom Russell relied upon when stating that the patent examiner was "not impressed" with the Complaint in this action. Neither Russell nor Katzer has addressed these rejections at the time this Amended Complaint is filed.

-13-

model trains on layouts.  It releases two products – DecoderPro and PanelPro, whose code has been subject to copyrights from the beginning.  These products are typically installed on one computer, and operate on that one computer.  The group consists of two to three dozen programmers.  The project has <u>never</u> been sponsored by any state or federal entity.  Jacobsen joined the group shortly after the project started.

40. DecoderPro is software that "simplifies the job of configuring complicated DCC decoders by providing screens on which you can select various options and values you want."  For example, if a hobbyist is using a model train with a decoder made by QS Industries (QSI) and wants to simulate a heavy freight train, which will slowly increase in speed, the hobbyist can make selections via a DecoderPro screen which will change QSI decoder to enforce the slow increase in speed.  Similarly, if the hobbyist wants to simulate a faster passenger train, he can make the changes via the DecoderPro screen.  As described by the JMRI Project website, modern DCC decoders are "complicated beasts" to program.  To make it easier to program them, developers write software – decoder definition files – to permit various brands of DCC decoders to be programmed through the JMRI Project's DecoderPro screens.  Developers include their names, version numbers and date of creation in the definition files.  QSI decoders are popular among hobbyists, but also notoriously complex to program.  DecoderPro, with its QSI-specific definition files, makes the job simple.   The JMRI Project and this software are well known among hobbyists using computers to control layouts, and have been reviewed in hobbyist magazines.

41. As open source software, DecoderPro is subject to a software license.  The software can be copied and changed as long as the JMRI Project gets appropriate credit, and it meets other requirements.   Jacobsen, who received assignments of copyrights from nearly all developers, registered the decoder definition files with the U.S. Copyright Office on June 13, 2006.  Exhibit C is the Copyright Registration.  In a shocking theft of the JMRI Project's intellectual property, Katzer created a software tool sometime in 2004 or early 2005 which specifically violates this software license.   Katzer distributed it with his

software.  It copies the files containing DecoderPro definitions and reformats them to the form needed by Katzer's product, but fails to give JMRI the prominent notice required by the software license.  Instead, Katzer gives <u>himself</u> full credit.  In his Decoder Commander manual, Katzer stated: "All decoders have unique characteristics. <u>KAM has created</u> a set of Decoder Templates that has these characteristics in an XML configuration file."  (emphasis added).  The KAM website states, "In June 2005 at the [NMRA] Cincinnati convention we Introduced Decoder Commander. The first XML based distributed programmer. This application has been under development since 2001."  This product functions only because Katzer included the converted JMRI Project decoder definition files.  As evidence of copying, the tool keeps the dates of creation and version numbers and various misspellings and other quirks, but Katzer <u>programmed the tool specifically to strip out the names of the developers who created the decoder definition files and the JMRI copyright notices</u>.  Until recently, Katzer even distributed most of the converted decoder definition files with his product, in violation of the copyright.  To this day, Katzer still distributes one decoder definition file – for the QSI decoder – in violation of the Jacobsen's copyright.  He offers the tool – which has no other purpose than to violate the copyright – via his website and thus knowingly encourages others to violate the copyright.

42. On information and belief, Katzer and KAM recognized costs and expenses for the "creation" of the decoder definition files, although the files are the property of the JMRI Project and its developers.  On information and belief, Defendants received a financial benefit from fraudulently claiming these costs and expenses.  Thus, Defendants received a financial benefit to which they are not entitled, which would be unjust for them to keep, and which belongs to the JMRI Project.

43. Katzer did not end his theft there.  He knew DecoderPro, JMRI Project trademark, belonged to the JMRI Project.[18]  DecoderPro is a distinctive mark or descriptive mark with secondary meaning, having been on the market for more than 5 years and having been reviewed in

_____

[18] On information and belief, Katzer has or is cybersquatting on others' trademarks.

1    model train magazines.

2    44. Katzer registered the domain www.decoderpro.com with the intent to profit from the JMRI

3        Project's goodwill in the trademark.

4    45. Jacobsen registered DecoderPro with the U.S. Trademark Office on Oct. 27, 2004.

5    46. As a part a settlement agreement in a trademark infringement case filed against Jerry

6        Britton in Oregon, Katzer transferred rights to www.decoderpro.com to Mr. Britton on the

7        condition that Mr. Britton not transfer them to anyone else, including the rightful owner

8        Jacobsen. In the settlement agreement, Katzer required Mr. Britton to pay him $20,000 if

9        Mr. Britton transferred the domain name to anyone else.  Katzer continues to intend to

10       profit in bad faith from the JMRI Project's goodwill.

11   47. Katzer regularly included JMRI trademarks in search engines to trick consumers to go to

12       his website, among other acts, to trade on the goodwill of JMRI marks.

13   48. Katzer also stole JMRI technology and patented it.  The JMRI Project released software on

14       an approximately monthly basis, and announced the releases and other news on a Yahoo!

15       listserv.  Jacobsen took a greater role in the organization, and eventually became one of the

16       leaders.   On information and belief, Katzer belonged to the listserv and received these

17       announcements.  He watched as yet another producer enjoyed the success that he could not.

18   49. On April 14, 2002, the JMRI Project released software with client-server capabilities.

19       Three days later, Katzer, through his attorney Russell, claimed those _exact_ capabilities in a

20       patent application, the '878 application, although the application did not meet the written

21       description requirements of 35 U.S.C. § 112.  The application issued as the '329 patent on

22       March 11, 2003.

23   Katzer, through his attorney Russell, begins unfair enforcement tactics

24   50. Because Defendants Katzer and Russell withheld material references and because

25       Defendants Katzer and Russell knew prior art either anticipated or made obvious the

26       inventions in the '329 patent, Defendants Katzer and Russell knew the '329 patent, and

27       other patents issued to Katzer which he and Russell made veiled threats to enforce, were not

28

-16-

1   valid and enforceable.

2   51. Despite knowing that the patents were invalid and unenforceable, Katzer through his

3   attorney Russell embarked on a scheme to enforce them and collect patent royalties.

4   52. On Sept. 18, 2002, Russell filed patent infringement lawsuits in U.S. District Court for the

5   District of Oregon, on behalf of Katzer and KAM against Dr. Hans Tanner of DigiToys and

6   Juergen Freiwald of Freiwald Software and certain distributors. The complaint against Dr.

7   Tanner alleged that Dr. Tanner's WinLok 1.5 and 2.0 infringed patents issued to Katzer.

8   The complaint against Mr. Freiwald alleged that Mr. Freiwald's Railroad & Co. software

9   infringed the patents issued to Katzer. Concurrent with filing the lawsuit, Russell sent cease

10  and desist letters to dealers who sold WinLok or Railroad & Co. software.

11  53. On Oct. 3, 2002, Dr. Tanner wrote Russell regarding the patent infringement cease and

12  desist letter. Dr. Tanner reminded Russell that WinLok 1.5 and 2.0 had been released in

13  1993 and 1995, respectively. Thus, Dr. Tanner said, Katzer's patent could not claim what

14  would have been barred under 35 U.S.C. § 102(b). Dr. Tanner also pointed out that at least

15  three other products had the capabilities claimed later by patents issued to Katzer – Railroad

16  & Co.'s software, MES software created by Heinrich Maile of Spain, and SoftLok software

17  created by a German manufacturer. All three also would have served to bar patents issued

18  to Katzer under § 102(b). Citing Katzer's "failure … to fully disclose the widely known and

19  extant body of prior art", Dr. Tanner accused Katzer of withholding references from the

20  patent examiner, in violation of Rule 1.56.

21  54. On Oct. 15, 2002, Mr. Freiwald wrote Russell regarding the patent infringement cease and

22  desist letter. Mr. Freiwald told Russell that his Railroad & Co. software program had been

23  sold since summer 1996. Like Dr. Tanner, Mr. Freiwald pointed out that WinLok 1.5 and

24  2.0, the Spanish MES program, the German SoftLok program pre-dated Katzer's patent

25  application by more than 1 year. Mr. Freiwald also noted that the German program MpC

26  also had capabilities claimed by the Katzer patent and was sold beginning in 1996. Thus

27  these would bar Katzer's patents. Then, Mr. Freiwald told Russell: "Furthermore, it can be

28

-17-

assumed that Katzer, as an expert in the market of software for model railroad computer control, was aware of the programs listed above when he filed his patents." Mr. Freiwald then accused Katzer of withholding references, in violation of Rule 1.56.

55. On information and belief, Katzer and Russell discussed the letters from Dr. Tanner and Mr. Freiwald. Realizing that the patents they had worked together to obtain would be held unenforceable and/or invalid, they decided to dismiss the lawsuit.  At the time, Russell and Katzer had 2 patent applications open for prosecution on the merits.  Although confronted with material references, they withheld them from the patent office.  They also did not seek re-examination of the patents-in-suit in the Tanner and Freiwald lawsuits.

56. Katzer's lawsuit against Dr. Tanner and Mr. Freiwald was dismissed on Dec. 20, 2002.

57. On information and belief, Katzer and Russell conspired to find other easier targets against which to enforce patents issued to Katzer. On information and belief, during 2003 and 2004, Katzer and Russell contacted several other hobbyists who offered software for controlling model trains. On information and belief, Katzer and Russell threatened them with patent infringement lawsuits and forced them to pay patent royalties. One such victim of these tactics was Glen Butcher who had offered free model railroad control system software called "loconetdd" and "railroadd" on his website. In September 2004, Mr. Butcher posted that he had been contacted by Katzer via e-mail. On information and belief, Katzer and/or Russell threatened Mr. Butcher with a patent infringement lawsuit and forced him to pay patent royalties. On information and belief, one or both defendants forced Mr. Butcher to take down his free software program. After Sept. 8, 2004, "loconetdd" and "railroadd" were no longer available for download.

58. Then, Defendants turned their attention to the JMRI Project.

59. On information and belief, in late 2004 and early 2005, Defendants conferred to discuss the JMRI Project software, which allows for model train control through a client-server system. JMRI has a following among model train enthusiasts who use model train control systems. Katzer and Russell know JMRI competes with Katzer's products. They set upon a plan to

force the JMRI Project to shut down or to pay royalties to KAM through various harassing tactics.

60. On or about March 8, 2005, Russell, acting upon Katzer's instructions, sent Jacobsen a letter accusing Jacobsen of infringing Claim 1 of the '329 patent. In this letter, Russell stated that KAM had an active licensing program, and wanted to license its patent to Jacobsen at $19 per program installed on a computer. On information and belief, this license was to be paid for past downloads and any future downloads. Knowing that Dr. Tanner and Mr. Freiwald were threatened in 2002, and knowing Katzer's substantial wealth allowed him to sue him, Jacobsen was concerned that he faced a patent infringement lawsuit. Jacobsen investigated Russell's assertion, but concluded that he did not infringe any valid claims.

61. Jacobsen responded to Russell's letter on March 29, 2005. He asked for information on the preliminary analysis that Russell had done and asked for Russell to show which JMRI modules infringed Claim 1 of the '329 patent. Russell did not respond for several months.

62. On or about Aug. 24, 2005, Russell wrote back with essentially the same response he provided in his March 8, 2005 letter. He also stated that he was reviewing whether JMRI infringed any other patents issued to Katzer. Russell included no detailed explanation of what JMRI modules infringed any claim in any Katzer patent. Russell claimed the license for Claim 1 of the '329 patent had risen $10 to $29 per license, and demanded $203,000 for the 7,000 copies that Jacobsen had said, at the end of summer 2005, had been distributed. On information and belief, the $29 license was to be a license paid not only for past downloads, but for future downloads. Russell enclosed a demand for payment and requested a response in 15 days.

63. On Oct. 20, 2005, Russell sent another letter to Jacobsen, with an invoice that included finance charges. The new total was more than $206,000.

64. Russell has continued to send letters to Jacobsen on a roughly monthly basis. Jacobsen responded on Jan. 31, 2006, stating that multiple examples of prior art anticipated claims in

the '329 patent and other patents supposedly invented by Katzer, and that both Katzer and Russell knew about them.

65. On or about Feb. 7, 2006, Russell responded, and continued to accuse Jacobsen of infringing the '329 patent.

66. On or about Oct. 27, 2005, Russell, on Katzer's and KAM's behalf, filed a Freedom of Information Act request with the U.S. Department of Energy ("DOE"), seeking e-mails and other communications between Jacobsen and others regarding JMRI Project software. Jacobsen's employer, the Lawrence Berkeley National Laboratory at the University of California, has a contract with DOE, and Jacobsen had used his DOE account on occasion to send messages to a public mailing list. This embarrassed Jacobsen in front of his employer. Jacobsen had to explain Defendants' harassing conduct to his employer and DOE.

67. The increase in exchanges between Russell, done on behalf of Katzer and KAM, and Jacobsen, had left Jacobsen in reasonable and serious apprehension that Katzer and KAM will sue him, despite all parties knowing that the patents are invalid and unenforceable.

68. A full version of the accused JMRI Project software was released on July 4, 2006. These versions will have the same capabilities as the prior version, which Defendants maintain infringe the '329 patent. Jacobsen expects Defendants to repeat their accusations that the new version infringes the '329 patent.

69. Jacobsen seeks resolution of this matter, seeks to end Defendants' harassment, and wants redress for the harm that Defendants' have inflicted on him and the JMRI Project.

COUNT ONE

Declaratory Judgment of Unenforceability of the '329 patent

Against all Defendants

70. Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 69.

71. Through their conduct, Katzer and KAM claim that the '329 patent is enforceable.

-20-

72. Jacobsen contends that the patent is unenforceable because of the fraud which Katzer and Russell committed on the Patent Office, and inequitable conduct including withholding references and lying about being the sole inventor.

73. By reason of paragraphs 70 through 72, an actual controversy exists between Jacobsen and Katzer and KAM as to the enforceability of the '329 patent. Jacobsen desires a judicial determination and declaration of respective rights and duties of the parties. Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## COUNT TWO

### Declaratory Judgment of Invalidity of the '329 patent

### Against all Defendants

74. Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 69.

75. Through their conduct, Katzer and KAM claim the '329 patent is valid.

76. Jacobsen contends that many, if not all, enforceable claims in the '329 patent are invalid under 35 U.S.C. §§ 102, 103 and 112.

77. By reason of paragraphs 74 through 76, an actual controversy exists between Jacobsen and Katzer and KAM as to the validity of the '329 patent. Jacobsen desires a judicial determination and declaration of respective rights and duties of the parties. Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## COUNT THREE

-21-

Declaratory Judgment of Non-infringement

Against all Defendants

78. Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 69.

79. Katzer and KAM claim products that Jacobsen distributes, infringe the '329 patent.

80. Jacobsen contends that that he does not, and has not, infringed any valid and enforceable claim of the '329 patent, because the methods practiced by JMRI products do not read on the patents and/or because Katzer has granted implied licenses to hobbyists such as Jacobsen through massive free distribution of Katzer's own products on KAM CDs.

81. By reason of paragraphs 78 through 80, an actual controversy exists between Jacobsen and Katzer and KAM as to the non-infringement of the '329 patent. Jacobsen desires a judicial determination and declaration of respective rights and duties of the parties. Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

COUNT FOUR

[Deleted pending receipt of written ruling] [19]

///

///

///

///

///

///

///

-22-

COUNT FIVE

UNFAIR COMPETITION UNDER § 17200[20]

Against All Defendants

82. Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 69.

83. Katzer and KAM have engaged in unlawful, unfair and/or fraudulent business acts and practices within the meaning of California Business and Professions Code § 17200 *et seq.* Specifically:

  a.   Katzer infringed copyrights on JMRI Project decoder definition files, in violation of federal copyright laws.  In doing so, Katzer took away from Jacobsen, owner and assignee of the copyright, a property right – the exclusive right to reproduce, distribute, and make derivative copies.

  b.   Katzer obtained a financial benefit by using JMRI Project decoder definition files instead of creating his own, and thus should be forced to disgorge this unjust enrichment.

84. Jacobsen will continue to suffer injury in fact, and has suffered the loss of property, as a result of Defendants' unfair competition.


COUNT SIX

CYBERSQUATTING IN VIOLATION OF 15 U.S.C. § 1125(d)

Against Katzer

85. Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 69.

---

[19] Plaintiff reserves the right to seek the reinstatement of his antitrust claim upon review of the Court's pending written ruling.
[20] Plaintiff specifically disclaims any claim in his Sec. 17200 claim for an activity that may constitute a protected activity under Cal. Civ. P. § 425.16.  Plaintiff reserves the right to seek an amendment, at a later date, to the Complaint to include these activities.

-23-

86. Jacobsen and the JMRI Project are the owners of the trademark DECODERPRO.

87. On information and belief, Katzer knew that DECODERPRO is a JMRI Project trademark.

88. On information and belief, Katzer registered the domain name www.decoderpro.com, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(d).

89. Jacobsen had rights to the trademark DECODERPRO before Katzer registered the name.

90. Katzer trafficked in the domain name when he transferred it to Jerry Britton and held on to rights in the domain name by threatening to force Mr. Britton to pay $20,000 if Mr. Britton transferred the domain name to another person, including the rightful owner, Jacobsen.

91. Thus, Katzer intends to profit in bad faith from the goodwill of Jacobsen's mark.

92. Jacobsen seeks statutory damages under 15 U.S.C. § 1117.

93. Unless Katzer is enjoined in its wrongful conduct, Jacobsen will suffer irreparable injury and harm for which there is no adequate remedy at law.


COUNT SEVEN

[Deleted pending receipt of written ruling][21]


COUNT EIGHT

VIOLATION OF COPYRIGHT LAWS

Against all Defendants

94. Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 69.

95. Plaintiff's work, and the work of other authors, is original.  He created the work and for that work created by others, plaintiff received valid transfers of the copyright from the other creators.  Thus, he is the owner and assignee of a valid copyright.

96. The copyrighted work is the subject of a valid Certificate of Copyright Registration issued by the Register of Copyrights.

97. Among the exclusive rights granted to plaintiff under the Copyright Act are the exclusive rights to reproduce the copyrighted work, distribute the copyrighted work to the public, and make derivative works from the copyrighted work.

98. Defendant had access to plaintiff's work.

99. Defendant copied original elements from the copyrighted work.  There are substantial similarities between Defendant's work and original elements of plaintiff's copyrighted work.

100.      Plaintiff is informed and believes that Defendants, without permission or consent, has made copies, distributed copies to the public, or created derivative works in violation of the exclusive rights.  Defendants' actions constitute infringement of plaintiff's copyright and exclusive rights under the Copyright Act.

101.      Plaintiff placed proper notices of copyright pursuant to 17 U.S.C. Sec. 401 on the work.

102.      Plaintiff is informed and believes that the foregoing acts of infringement have been willful, intentional, in disregard of and with indifference to the rights of plaintiff.

103.      Defendant has a financial interest and the right and ability to supervise others' infringing activities, such a reproducing, preparing derivative works, distributing and using the works.

104.      Defendant knew or should have known of infringing activity and induced or caused or materially contributed to the activity.

---

[21] Plaintiff reserves the right to seek the reinstatement of his antitrust claim upon review of the Court's pending written ruling.

105.     Plaintiff seeks statutory damages under 17 U.S.C. Sec. 504 for Defendant's

infringing conduct done on or after June 13, 2006.

106.     Plaintiff seeks enhanced statutory damages for willful infringement under 17 U.S.C.

Sec. 504, and attorney's fees and costs under 17 U.S.C. Sec. 505.

107.     Unless Katzer is enjoined in its wrongful conduct, Jacobsen will suffer irreparable

injury and harm for which there is no adequate remedy at law.  Thus, pursuant to 17 U.S.C.

Sec. 502 and 503, plaintiff is entitled to injunctive relief prohibiting Defendants from

further infringing plaintiff's copyright and an order directing Defendants to deliver and

destroy all copies of infringing products made in violation of plaintiff's exclusive rights.


COUNT NINE

Violation of 15 U.S.C. § 1125(c)

Against all Defendants

108.     Jacobsen repeats and realleges each and every allegation in paragraphs 1 through

69.

109.     The JMRI Project trademarks have been used in interstate commerce since 2001.

Such use has been continuous, uninterrupted, and extensive.

110.     Consumers rely on JMRI marks to identify and designate JMRI products and to

distinguish them from the products of others.  The JMRI marks are famous.  Plaintiff owns

various trademarks for the JMRI Project.

111.     Defendants use the exact, or substantially similar marks in connection with selling,

offering for sale, promotion or advertising of its product. Such use dilutes the JMRI marks.

This use is not authorized by plaintiff.   This use also constitutes commercial use of the

JMRI marks.

112.     Defendants began their commercial use of the JMRI marks after the JMRI marks had become famous and Defendants are willfully continuing to trade upon JMRI's hard-earned reputation and goodwill, all to the detriment and damage of JMRI.

113.     Defendants' use of the JMRI marks dilutes the quality of the JMRI marks by diminishing the capacity of the JMRI marks to identify and distinguish JMRI goods. Defendants' use of the JMRI marks also dilutes the quality of JMRI marks by tarnishing the good name and reputation of JMRI.

114.     Defendants' acts of trademark dilution have been deliberate, knowing, willful and/or in bad faith.

115.     Plaintiff has been damaged as a direct and proximate result of Defendants' wrongful acts and such damage will continue unless the Court enjoins Defendants' conduct.

116.     Unless Defendants are enjoined in their wrongful conduct, Jacobsen will suffer irreparable injury and harm for which there is no adequate remedy at law.


COUNT TEN

Unjust Enrichment

Against all Defendants

117.     Jacobsen repeats and realleges each and every allegation in paragraphs 1 through 69.

118.     Jacobsen, as owner and assignee of a valid copyright, provided valuable decoder definition files to the public, subject to a software license.

119.     Katzer took JMRI Project decoder definition files subject to a copyright, took credit for the work and used it for his own commercial gain.  Thus, he received a benefit from Jacobsen's copyrighted work.

120.     Katzer earned profits, and recognized expenses and costs for his "creation" of this work in his tax returns.

121.     Katzer retained these profits, and never paid these expenses and costs because he stole JMRI Project software.

122.     Katzer received a financial benefit as a result of claiming these expenses and costs, which would be unjust for him to keep.

123.     Jacobsen and the JMRI Project suffered a loss of credit for the hundreds of hours of work put into the copyrighted work's creation.

124.     Thus, Katzer should be forced to provide restitution to the JMRI Project and Jacobsen for the theft.

PRAYER FOR RELIEF

WHEREFORE, Jacobsen respectfully requests that the Court enter

A.  A declaration that Jacobsen has not and does not infringe any valid and enforceable claim of the '329 patent.

B.  A declaration that the '329 patent is invalid.

C.  A declaration that the '329 patent is unenforceable because of fraud on the Patent Office during the prosecution of the '461 application.

D.  A declaration that the '329 patent is unenforceable because of inequitable conduct during the prosecution of the '461 application.

E.  A declaration that the '329 patent is unenforceable because of fraud on the Patent Office during the prosecution of the '878 application.

F.  A declaration that the '329 patent is unenforceable because of inequitable conduct during the prosecution of the '878 application.

-28-

G.  An injunction prohibiting Defendants, their officers, agents, employees, assigns, attorneys, parents, subsidiaries or other persons in active concert or participation with Defendants from asserting any claim of the '329 patent against any other person in the United States.

H.  For patents owned by Katzer or KAM that remain enforceable, an injunction ordering Katzer to identify all patents and patents applications filed in the United States and throughout the world, to produce to their respective patent offices all material references discovered through this litigation, and to request re-examination (or the nearest equivalent proceeding outside the U.S.) of any patents issuing from the patent applications.

I.  A decree finding that Katzer and KAM have engaged in unlawful, unfair and/or fraudulent business practices in violation of the California Unfair Competition Act, California Business and Professions Code § 17200 *et seq* and ordering the return of property interests taken by Defendants.

J.  An order finding that Katzer has cybersquatted on the trademarked name, www.decoderpro.com, owned by Jacobsen in violation of the Lanham Act, 15 U.S.C. § 1125(d), and requiring Katzer to release any rights he has in said domain name and return said domain name to Jacobsen.

K.  An order finding that Katzer has diluted JMRI trademarks in violation of the Lanham Act, 15 U.S.C. § 1125(c).

L.  An order enjoining Katzer and KAM, and all persons and entities under their direction or control, from engaging in or carrying out any further conduct in violation of the Lanham Act.

M.  An order requiring Katzer and KAM, and all persons and entities under their direction or control, to deliver and destroy all infringing products.

N.  An award for statutory damages pursuant 15 U.S.C. § 1117.

O.  An accounting by Defendants of any and all profits derived from Defendants' wrongful acts and an award to plaintiff of such profits made by Defendant, in an amount to be proven at trial pursuant to 15 U.S.C. § 1117(a).

P.  An award of treble damages of enhanced profits on account of Defendants' willful, intentional, and bad faith conduct, pursuant to 15 U.S.C. § 1117(b).

Q.  An order enjoining all Defendants, and all persons and entities under their direction or control, from engaging in or carrying out any further unlawful, unfair or fraudulent business practices in violation of the California Unfair Competition Act.

R.  An order finding that Katzer has willfully infringed copyrights, and an award for statutory damages.

S.  An order finding that Katzer has unjustly enriched himself and KAM, and ordering Defendants to provide restitution.

T.  An order referring the matter to the appropriate U.S. Attorney's Office for investigation into perjury and mail fraud, and cancellation proceedings against any patents involved in this litigation, and any related patents.

U.  A determination by the Court that this is an exceptional case and that therefore plaintiff be awarded costs and attorney's fees as permitted by law, including 35 U.S.C. § 285, 17 U.S.C. § 505 and 15 U.S.C. § 1117(a).

V.  An order granting any other damages or remedy to which plaintiff may be entitled.

W. An order granting any other relief the court finds just.

///

///

///

-30-

1    DATED:  September 11, 2006

2
                                         By _____/s/_____
3                                             Victoria K. Hall, Esq. (SBN 240702)
                                              LAW OFFICE OF VICTORIA K. HALL
4                                             401 N. Washington St. Suite 550
                                              Rockville MD 20850
5
                                              Telephone:      301-738-7677
6                                             Facsimile:      240-536-9142

7                                         ATTORNEY FOR PLAINTIFF

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        -31-