DAVID McGOWAN (SBN 154289)
Warren Hall
5998 Alcala Park
San Diego CA 92110
dmcgowan@sandiego.edu
Telephone: 619-260-7973
Facsimile: 619-260-2748

VICTORIA K. HALL (SBN 240702)
LAW OFFICE OF VICTORIA K. HALL
3 Bethesda Metro Suite 700
Bethesda MD 20814
Victoria@vkhall-law.com
Telephone: 301-280-5925
Facsimile: 240-536-9142

Attorneys for Plaintiff
ROBERT JACOBSEN

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT JACOBSEN, an individual, <br><br> Plaintiff, <br><br> v. <br><br> MATTHEW KATZER, an individual, and KAMIND ASSOCIATES, INC, an Oregon corporation dba KAM Industries, <br><br> Defendants. | No. C-06-1905-JSW <br><br> **MOTION FOR SUMMARY JUDGMENT** <br><br> Date:  December 4, 2009 <br> Time:  9:00 a.m. <br> Courtroom:  11, 19th Floor <br> Judge:  Hon. Jeffrey S. White <br><br> Filed concurrently: <br> 1. Administrative Motion to Seal <br> 2. Declaration of Robert Jacobsen Relating to Copyright Assignments in Support of Motion for Summary Judgment <br> 3. Declaration of Robert Jacobsen in Support of Motion for Summary Judgment <br> 4. Declaration of Victoria K. Hall in Support of Motion for Summary Judgment <br> 5. Declaration of Victoria K. Hall in Support of Administrative Motion to Seal <br> 6. Declaration of Robin Becker in Support of Motion for Summary Judgment <br> 7. Declaration of Jack Shall in Support of Motion for Summary Judgment <br> 8. Proposed Order |

SUMMARY OF ARGUMENT

This case has a lengthy and complex history. That is over now.  The core of the case is simple.  It is about how not to enter a market.  Defendant Matthew Katzer testified that in 2004 he was deciding how to enter the market for software that programs model train decoder chips.  To facilitate entry Mr. Katzer and his company first took JMRI's trademark and then its software.

Knowing the distinctive mark "DecoderPro" designated JMRI software, Defendants registered "decoderpro.com" to preserve an option to commercialize JMRI's work.  When asked, Defendants refused to transfer the domain to Jacobsen.   When he ultimately had to relinquish the domain to a third party, Mr. Katzer demanded that the domain not be re-transferred to JMRI.  Such warehousing of a competitor's mark to facilitate entry into a market is cybersquatting.

Defendants then went into the market with software that competed with DecoderPro and which, secretly, rested on a foundation of code copied literally, line-for-line, from DecoderPro.  Discovery confirmed Mr. Katzer's already-admitted copying.  It confirmed as well that there are no other factual disputes regarding Professor Jacobsen's copyright claim.

To combat the present infringement claims, Defendants bought rights to a few reference manuals a chipmaker, QSI, posts on the Internet to help railroaders program chips.  Two JMRI programmers had used these manuals, with QSI's permission and assistance, in their work.  Defendants kept this assignment secret for 27 months and then brought a counterclaim based upon it. These facts establish Professor Jacobsen's license, fair use, and laches defenses.

Finally, though Defendants copied JMRI code they did not reproduce JMRI's copyright management information, which was missing when Defendants distributed the code under their own claim of rights. Such removal and misattribution are elements of Professor Jacobsen's claim under the DMCA.  Summary adjudication of this element is proper at this time.  Defendants deny that such removal was deliberate, however, so their intention remains an issue for trial.

# **Table of Contents**

I.   Defendants Took "Decoderpro.com" As An Option
     To Facilitate Entry Into JMRI's Market..................................................2

II.  Defendants Admit Copying JMRI Code and the Undisputed Facts Establish
     That This Admitted Copying Is Infringement...........................................4

     A.   Professor Jacobsen Owns A Valid Copyright In the Selection of
          Decoder Files In the JMRI Program and in the Selection and
          Arrangement of Data Within Those Files.........................................5
     B.   Defendants Reproduced and Distributed Protected Expression...............5
          1.   Professor Jacobsen's Registration Confers
               On Him A Presumption of Ownership And Validity
               of Copyright; He Does Not Bear A Further Burden
               of Showing Copyrightability.................................................6
          2.   At The Most General Level, The Copied Files Compiled
               the Subset of Decoder Definitions JMRI Developers Valued
               Most; Their Selection Is Protected Expression..........................7
          3.   Professor Jacobsen Has Never Claimed Rights in "Raw Data"
               Or Any Other Material Written By Manufacturers;
               Defendants' Suggestion to the Contrary Is A Red Herring............8
          4.   More Particularly, The Copied Files Embody Selection and
               Arrangement Designed to Create A User-Friendly Computer
               Program.......................................................................9

III. Summary Judgment Is Appropriate On Three of Professor Jacobsen's Defenses
     to the Counterclaim.......................................................................12
     A.   The Undisputed Facts Show JMRI Programmers Had Permission
          to Reproduce and Distribute QSI Material.....................................12
     B.   The JMRI Programmers' Use of QSI Material Was Fair......................15
     C.   Defendants' Counterclaim Is An Inequitable Tactic
          Barred By Laches...............................................................17

IV.  Defendants Admit They Removed Copyright Management Information
     From JMRI Files Without Authorization; Partial Summary Judgment
     on Professor Jacobsen's DMCA Claim is Therefore Appropriate.................18

<u>Table of Authorities</u>

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................................................1

*Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454 (S.D.N.Y. 2009)...................18

*Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104 (9th Cir.1990)......................................6

*Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2004) ........................................2, 3

*Bourne v. Walt Disney Co.* 68 F.3d 621 (2d Cir. 1995) ..........................................................12

*Calif. Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451 (9th Cir. 1985) ................................2

*CCC Info. Servs, Inc. v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61 (2d Cir. 1994)......10, 11

*CDN, Inc. v. Kapes*, 197 F.3d 1256 (9th Cir. 1999)...........................................................7, 11

*Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078 (9th Cir. 2000).................................................17

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) .......................................................17

*Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009)...........................5, 6, 8

*Empro Mfg. Co. v. Ball-Co. Mfg., Inc.*, 870 F.2d 423 (7th Cir. 1989).......................................15

*Federal Land Bank of Wichita v. Bd. of County Comm'rs*, 368 U.S. 146 (1961) ........................12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ...................................4, 8, 11

*Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986).......................................................................15

*Foad Consulting Group Inc. v. Azzalino*, 270 F.3d 821, 826-27 (9th Cir. 2001)............................14

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135
    Cal. Rptr. 2d 505 (Cal. App. Ct. 2003)........................................................................14

*Graham v. James*, 144 F.3d 229 (2d Cir. 1998) .................................................................12

*Green Book Int'l Corp. v. Inunity Corp.*, 2 F. Supp. 2d 112 (D. Mass. 1998)..............................15

*Kelly v. Arriba Soft Corp.*, 336 F. 3d 811 (9th Cir. 2003)....................................................15

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*, 945 F.2d 509 (2d Cir. 1991)...............7

*Kregos v. Associated Press*, 937 F.2d 700 (2d Cir. 1991)....................................................7, 8

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) .....................................................1

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 (1986) ...........................................1

*McClatchey v. Associated Press*, No. 3:05-cv-145, 2007 WL 776103 (E.D. Pa. Mar. 9, 2007) ..... 18

*Netbula, LLC v. BlindView Dev. Corp.*, 516 F. Supp. 2d 1137 (N.D. Cal. 2007).............................12

*Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922 (9th Cir. 1999) ...........12

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989).................................................12

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2d Cir. 2000) ..........................3

*Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004)...................................................................6

## Statutes

15 U.S.C. §1057(b)...................................................................................................2

15 U.S.C. §1125(d)(1)(B).............................................................................................3

17 U.S.C. § 103 .......................................................................................................8

17 U.S.C. § 103(b)....................................................................................................5

17 U.S.C. § 1202 .................................................................................................18, 19

17 U.S.C. § 201(c)....................................................................................................8

17 U.S.C. §103(b).....................................................................................................8

17 U.S.C. §107 .......................................................................................................15

## Treatises

William F. Patry, *Patry on Copyright* §10.155 (2009)..........................................................16

## Rules

Fed. R. Civ. P. 56 ....................................................................................................1

Fed. R. Civ. P. 56(c).................................................................................................1

1                                      <u>NOTICE OF MOTION</u>

2    TO THE PARTIES AND THEIR ATTORNEYS OF RECORD

3          PLEASE TAKE NOTICE that on Friday, December 4, 2009, at 9:00 a.m. in Courtroom 11,

4    19th floor of the San Francisco Division of the United States District Court for the Northern

5    District of California, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff

6    Robert Jacobsen will move for summary judgment of his copyright infringement claim,

7    cybersquatting claim, and Defendants' copyright infringement counterclaim, and partial summary

8    judgment on his DMCA claim, pursuant to Federal Rules of Civil Procedure 56.  This Motion is

9    based on this Memorandum of Points and Authorities and the supporting evidence submitted with

10    it.

11                           <u>CONCISE STATEMENT OF RELIEF SOUGHT</u>

12          Pursuant to FRCP 56, Plaintiff seeks summary judgment in his favor on three of his

13    defenses to Defendants' counterclaim.  Plaintiff seeks partial summary judgment (on the liability

14    elements but not damages) of his claims for cybersquatting and copyright infringement.  He also

15    seeks partial summary judgment on the removal and misattribution elements of his claim for

16    violation of the DMCA, but not on the intent element of that claim.

17                                  <u>POINTS AND AUTHORITIES</u>

18          Summary judgment is appropriate where there is no genuine issue as to any material fact

19    and the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby,*

20    *Inc.*, 477 U.S. 242 (1986);  Fed. R. Civ. P. 56(c). The court must draw all justifiable inferences in

21    favor of the non-moving party, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991),

22    but that party "must do more than simply show that there is some metaphysical doubt as to the

23    material facts." *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).  "The

24    mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which

25    the jury could reasonably find for the [non-moving party]." *See Anderson v. Liberty Lobby, Inc.*,

26    477 U.S. at 252.

27

28

## I.    Defendants Took "Decoderpro.com" As An Option To Facilitate Entry Into JMRI's Market

Defendants registered a domain name identical in all relevant respects to JMRI's DecoderPro mark. They did so to facilitate entry and keep the mark away from JMRI. Summary judgment therefore is appropriate on Professor Jacobsen's cybersquatting claim.

> A trademark owner asserting a claim under the ACPA must establish the following: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit.

*Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2004).

Jacobsen holds a trademark registration for DecoderPro. Declaration of Robert Jacobsen In Support of Motion for Summary Judgment ("Jacobsen Decl.") ¶ 1, Ex. A. Thus, he is the owner. 15 U.S.C. §1057(b). Because it was published on the principal register, the mark is distinctive. *Calif. Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985). The domain name "decoderpro.com" is essentially identical to Jacobsen's mark, and Defendant Katzer admits he registered that domain name. The first four elements of the claim are therefore met.

The fifth element is met as well. Mr. Katzer admits ███████████████

███████████████████████████████████████████████████████████████

---

[1] Deposition transcript excerpts and certain other exhibits are located in either the Declaration of Victoria K. Hall in Support of the Motion for Summary Judgment (non-confidential materials) or the Declaration of Victoria K. Hall in Support of Administrative Motion to Seal (confidential or highly confidential materials).

This registration created two economic benefits for Defendants. The option to use the mark as a domain itself was valuable--that is why Defendants bothered to warehouse the name. And by registering decoderpro.com Defendants prevented JMRI from using the domain name most similar to its mark. *Id.* 48:9-10. Mr. Katzer stresses that JMRI is his competitor, Declaration of Matthew Katzer in Support of Opposition to Plaintiff's Motion for Preliminary Injunction [Docket #261] [hereinafter Katzer P.I. Decl.] ¶32, and his registration effectively deprived his competitor of a valuable asset.

Not surprisingly, once Mr. Katzer registered the domain he did his best to keep it from JMRI. When Professor Jacobsen wrote Defendant Katzer asking him to return the domain (and offering to reimburse Mr. Katzer's registration costs), Mr. Katzer never responded. RFA Responses 22-23; ████████████████  Most tellingly, even when he had to relinquish rights in decoderpro.com to a third party Mr. Katzer insisted on settlement terms designed to ensure that JMRI not end up with the name. Britton Dep. 38:5-7 (Mr. Katzer "said that I could not give it to the JMRI group"); *Id.* 45: 21-25.[2]  Declaration of Victoria K. Hall [Hall Decl.] Ex. J at 5 (settlement agreement between Katzer and Britton, paragraph 6).

These facts establish bad faith. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202 F.3d 489, 499 (2d Cir. 2000), is on point. The court there held that "the most important ground" supporting its finding that the defendant acted in bad faith was that the defendant "planned to enter into direct competition with" the mark owner and registered the domain "for the primary purpose of keeping [the plaintiff] from using that domain name." *Id.* On these facts the court held "no reasonable factfinder could return a verdict against" the plaintiff. *Id.* at 498. The facts here— particularly Mr. Katzer's insistence that JMRI not have the domain even when he gave it up—

---

[2] The context of the exchange was that Mr. Britton had registered a domain name in which Mr. Katzer claimed rights. Mr. Katzer proposed that he give Mr. Britton "decoderpro.com" in exchange for the name Mr. Katzer claimed. The idea for the swap was Mr. Katzer's. Britton Dep. 37:5-13. Absent the restriction on transfer Mr. Katzer demanded, Mr. Britton would have transferred the domain to JMRI. *Id.* 111:15-17.

1    compel the same conclusion.[3]

2         Analysis of the relevant nonexclusive statutory factors for bad faith, 15 U.S.C.

3    §1125(d)(1)(B), confirms this conclusion: Defendants never claimed rights in DecoderPro and had

4    no basis to do so (factor one); the mark is not Defendant Katzer's personal name (factor two);

5    Defendants never used the mark in connection with their products (factor three); they made no fair

6    use or non-commercial use of the domain name (factor four); Defendants' admitted purpose of

7    preserving an option to commercialize JMRI's own product shows an intention (albeit one not

8    ultimately realized) to divert consumers from JMRI (factor five); Defendants also registered the

9    marks of another competitor, Freiwald Software, which Defendants admit they knew belonged to

10   Freiwald (factor eight), Defendants' Response to Jacobsen's Request for Admission No. 6; and as

11   noted above, "DecoderPro" is a distinctive mark (factor nine).

12        Warehousing marks to facilitate entry is cybersquatting, and the admitted warehousing here

13   justifies summary judgment in Professor Jacobsen's favor on the liability elements of his

14   cybersquatting claim.

15

16   **II.    Defendants Admit Copying JMRI Code and the Undisputed Facts Establish That This**
17   **Admitted Copying Is Infringement**

18        Defendants were unable to retain decoderpro.com or to keep it from JMRI.  But though

19   they could not commercialize JMRI code under the DecoderPro name they could and did copy

20   JMRI code into their own program. This fact was admitted over a year ago.

21        To prevail on this claim Professor Jacobsen must show he owns a valid copyright and that

22   Defendants reproduced protected elements of the copyrighted work. *Feist Publ'ns, Inc. v. Rural*

23   *Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  There is no factual dispute on either element. Summary

24   judgment therefore should be entered in Professor Jacobsen's favor on his copyright claim.

25

26

27   _____
     [3] Although Defendants ultimately did not commercialize JMRI's software, that fact does not
28   mitigate liability.  Bad faith intent to profit is enough.  *Bosley Med. Inst.*, 403 F.3d at 680 ("the

-4-

A.   **Professor Jacobsen Owns A Valid Copyright In the Selection of Decoder Files In the JMRI Program and in the Selection and Arrangement of Data Within Those Files**

Professor Jacobsen is the owner by assignment of the decoder definition files written by JMRI programmers.  Declaration of Robert Jacobsen Regarding Copyright Assignments in Support of Motion for Summary Judgment [hereinafter Jacobsen Assignment Decl.] Ex. B.   The record contains no contrary evidence.

Professor Jacobsen owns copyright registrations in the relevant files.  The relevant registrations claim the selection and arrangement of pre-existing data.  Jacobsen Decl. ¶ 30; Second Amended Complaint App. C-L.   Under 17 U.S.C. §103(b), this claim "does not imply any exclusive right in the preexisting material" and Professor Jacobsen has never asserted any such claim. Jacobsen Decl. ¶31. The record contains no evidence contesting this registration.

B.   **Defendants Reproduced and Distributed Protected Expression.**

Defendants hired a programmer, Robert Bouwens, to develop Defendant KAM's "Decoder Commander" program. Katzer P.I. Decl. ¶¶ 7-8. Mr. Bouwens copied version 1.7.1 of JMRI's Decoder Definition Files and wrote a software tool to copy code from those files and translate them into the Decoder Commander format. *Id.* at ¶¶ 7-8; Jacobsen Decl. ¶ 38-42 . ███████

███████████████████████████████████████████████████████████

███████ Defendants then distributed these files as part of their program.  Katzer P.I. Decl. ¶¶ 7, 15-16, 23.  The record contains no evidence to the contrary.

At the preliminary injunction hearing last December, Defendants argued that Professor Jacobsen had not established the extent of his ownership of the copied code.[4]  This court noted that argument in denying Professor Jacobsen's motion for preliminary relief.  Jan. 5, 2009 Order at 14 n.3.  Professor Jacobsen takes this Court's comments very seriously.  For that reason, and because this point is the only one Defendants have ever raised in defense of their copying, we now show that this point raises no factual issues and that the law entitles Professor Jacobsen to summary

---

ACPA does not contain a commercial use requirement").
[4] Order Granting Motion to Dismiss for Mootness; Granting in Part and Denying in Part Motion to Dismiss for Failure to State a Claim; Denying Motion to Strike; and Denying Motion for Preliminary Injunction [hereinafter Jan. 5, 2009 Order] [Docket 284] at 14 n.3.

1    judgment on his infringement claim.

2            1.      **Professor Jacobsen's Registration Confers On Him A
3                    Presumption of Ownership And Validity of Copyright; He
                     Does Not Bear A Further Burden of Showing Copyrightability**

4            "A certificate of registration raises the presumption of copyright validity and ownership."

5    *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 987 n.2 (9th Cir. 2009); 17 U.S.C.

6    §410(c). Defendants bear the burden of establishing any challenge to this presumption, which

7    extends to the originality of the work.   *Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004)

8    (defendant may overcome presumption "only by demonstrating that" the plaintiff's work "is not

9    original"); *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir.1990) ("[A]

10   certificate of registration constitutes *prima facie* evidence of copyrightability and shifts the burden

11   to the defendant to demonstrate why the copyright is not valid.").

12           Contrary to Defendants' suggestion to the Court last December, therefore, once Professor

13   Jacobsen submits his registration he is not required to go further and single out specific elements of

14   the work that are protected. The Ninth Circuit rejected the premise of this claim in *Dream Games*.

15   In that case, the trial court instructed the jury that certain elements of a computer program were not

16   copyrightable but declined to instruct the jury on which elements were copyrightable.  The Ninth

17   Circuit rejected a challenge to this refusal to instruct, holding "[n]o case law or legal theory

18   requires that 'protectable' elements be identified" after unprotectable elements are specified. 561

19   F.3d at 989.

20           If copyright plaintiffs bear the burden of singling out copyrightable elements of a registered

21   program, as Defendants suggested last December, the Ninth Circuit would have reversed the

22   district court in *Dream Games* for refusing to give the requested instruction.  The Ninth Circuit's

23   holding thus entails the rejection Defendants' argument.  It follows that it is not enough for

24   Defendants to make assertions about what Professor Jacobsen must prove.  They must establish

25   any defense they seek to raise.  In the next three sections, Professor Jacobsen shows they have not

26   done so.

27

28

1              **2.**        **At The Most General Level, The Copied Files Compiled the Subset of**

2                           **Decoder Definitions JMRI Developers Valued Most; Their**
                          **Selection Is Protected Expression**

3        Professor Jacobsen claims rights in the "entire set of decoder definition files" contained in

4 JMRI's DecoderPro program.  Jacobsen Dep. 35:7-10.  *See also id.* 13-14, 17-19; 41:5-10; 42:22-

5 25.  DecoderPro, including version 1.7.1, which Defendants admit to copying, was not a

6 comprehensive collection of every decoder in existence.  Version 1.7.1 contained 102 decoder

7 definition files defining 291 decoders.  At the time it was made available, there were approximately

8 500 decoders available in the market.  Jacobsen Decl. ¶ 43.

9

10        JMRI programmers wrote decoder definitions for the decoders they found most interesting

11 and useful.  Jacobsen Dep. 35:7-10.  Their selection of these decoders from the greater universe of

12 decoders reflects their experience with that universe.  *Id.*  Their selection is analogous to an

13 anthologist's selection of the best short stories in the public domain, an author's selection from the

14 universe of all baseball statistics those he finds best suited to assess a pitcher's likely performance,

15 and to the selection from the universe of all businesses the subset of businesses of likely interest to

16 Chinese Americans.  All these are copyrightable selections. *Kregos v. Associated Press,* 937 F.2d

17 700, 706-07 (2d Cir. 1991) (statistics); *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.,*

18 945 F.2d 509, 514 (2d Cir. 1991) (business directory).

19

20        The subset of files Defendants copied did not originate with any particular manufacturer,

21 nor with the NMRA. Only JMRI developers selected the files found in version 1.7.1.  In copying

22 JMRI's program Defendants misappropriated this selection and saved itself the work of making its

23 own selection from the universe of possible decoders.  That is infringement.  *See CDN, Inc. v.*

24 *Kapes*, 197 F.3d 1256, 1260 (9th Cir. 1999) (affirming liability for reproduction of prices reflecting

25 selection from broader universe of price-related data).

26

27

28

3.   **Professor Jacobsen Has Never Claimed Rights in "Raw Data"**
     **Or Any Other Material Written By Manufacturers;**
     **Defendants' Suggestion to the Contrary Is A Red Herring**

As noted above, Professor Jacobsen's registrations claim selection and arrangement of pre-existing material, as well as material written by JMRI authors.  At the preliminary injunction hearing Defendants termed this pre-existing material "raw data" and suggested that Professor Jacobsen's copyright claim would fail because he did not own such data.  This Court noted this point as well in its order denying preliminary relief. Jan. 5, 2009 Order at 14 n.3.

With genuine respect for the skillful advocacy of our opponents, we submit this argument is, and always has been, a red herring.  At no time has Professor Jacobsen ever claimed exclusive rights in material written by model train manufacturers, see Jacobsen Decl. ¶ 31, and the statutory basis of his registrations explicitly disavows such a claim. 17 U.S.C. §103(b).  Professor Jacobsen claims rights in the selection and arrangement of such material in the JMRI program. Defendants are and always have been free to create files based on this data in its "raw" form.  Professor Jacobsen has no objection whatever to Defendants' doing their own work with such data.  He objects only to the wholesale literal copying of the selection and arrangement of such data from JMRI's Decoder Definition Files to KAM's Decoder Commander program.

By failing to account for the distinction between data and the selection and arrangement of it, Defendants' position misstates the law.  The Copyright Act protects the original selection and compilation of data even if those data are themselves not copyrightable subject matter, *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344-45 (1991), 17 U.S.C. §§ 103; 201(c) ; *Dream Games*, 561 F.3d at 988, and even if they have been published elsewhere, *Kregos*, 937 F.2d at 706.  Even if everything Defendants say about the "raw data" is true, therefore, it has no effect on JMRI's rights in its programmers' selection and arrangement of those data.[5]

---

[5] Finally, the record reflects no dispute that the JMRI Decoder Definition Files do contain material originating with JMRI authors.  Penny Dep. 131:19-132:2; 135:6-136:4;  Jacobsen Decl. ¶¶ 20, 22.  The registration (and Defendants' infringement liability) properly extends to this material, too.  No evidence contradicts this claim.

-8-

#### 4.      More Particularly, The Copied Files Embody Selection and Arrangement Designed to Create A User-Friendly Computer Program.

The preceding sections show that the set of JMRI files Defendants copied is itself a protected selection of files and that Professor Jacobsen does not claim rights in "raw data" within those files.  He does claim rights in the selection and arrangement of such data within those files, however, and Defendants infringed his rights by copying that selection and arrangement.

To understand the selection and arrangement present within individual files, it helps to understand what JMRI's "DecoderPro" program does.

Modern model train engines have chips in them that control what the trains do.  Before software programs such as JMRI's DecoderPro, railroaders had to program these chips by typing numbers into a handheld box that ran the train layout.  They had to type numbers for each function (at the time, most chips had 30-40).  They could not adjust any function other than by re-typing it. If the decoder chip malfunctioned and lost the typed-in data, the railroader had to start all over again.  Declaration of Jack Shall In Support of Motion for Summary Judgment ("Shall Decl.") ¶¶ 4-5; Jacobsen Decl. ¶ 4; Pruss Dep. 16:4-17:8; Britton Dep. 15:4-17.

JMRI's purpose was and is to create an easy and user-friendly way to program these chips. DecoderPro presents railroaders an intuitive interface that allows them, for example, to adjust the brightness of a light by moving a slider on their computer rather than punching in different numbers.  DecoderPro stores the railroader's choices so they are not lost if the chip malfunctions. This easy-to-use method is more and more important as chips become increasingly complex. Rather than 30-40 variables, chips now have well over 100 and up to 200.  Shall Decl. ¶¶ 4, 8.  *See also* Britton Dep. 19:6-13.

Professor Jacobsen's creative work is the foundation of the code Defendants copied.  He created the first JMRI decoder definitions, including the overall structure and basic vocabulary that formed the basis for later JMRI decoder definitions. Jacobsen Decl. ¶ 6-8. He wrote these basic definitions to ensure they would work with other JMRI code.  Professor Jacobsen considered many things while developing these basic definitions, including how to structure the format of the decoder definition files, how decoders store configuration information in bits and bytes, how users

1  think about decoder configurations, which parts of the configuration will change more often and

2  which less often, and the different terminologies used by the NMRA, by modelers, and by

3  manufacturers. *Id.*

4      With respect to each of these considerations, Professor Jacobsen made the choices he felt

5  would best accomplish JMRI's goals. For example, Professor Jacobsen focused the JMRI

6  definitions on the model railroader's view of the process rather than on a purely logical approach.

7  Jacobsen Decl. ¶ 8.  He used terms he thought railroaders were most likely to use. Id. He could

8  have written the definitions very differently. Id.  He could have settled on using only NMRA

9  terminology to create a standard, or only using manufacturer data, for example.  Id.  Or he could

10  have focused on the decoder's organization of the information instead of focusing on a model

11  railroader's typical organization. Id.  Such fundamental choices are protectable under copyright

12  law, and they pervade the files Defendants copied. *Cf. CCC Info. Servs, Inc. v. Maclean Hunter*

13  *Market Reports, Inc.*, 44 F.3d 61, 67 (2d Cir. 1994) (Leval, J.) (even choice of logical over other

14  forms of organizations satisfies originality requirement for compilation).

15      Later authors of other files have generally followed these choices as they wrote their own

16  specific decoder definition files.[6] Within the general structure Professor Jacobsen created, these

17  authors make choices that reflect their judgment of how best to accomplish the goal of creating a

18  user-friendly way to program decoders.  Jacobsen Decl. ¶¶ 8-9; Penny Dep. 132:20-133:4; Mosher

19

20

---

21  [6] For instance, with QSI files, the original developer, Howard Penny, created 5 subsets of
22  information to base 5 files on. Penny Dep. 30:2-9; 135:6-136:4; 166:8-14.  In one file,
   QSI_Electric, Penny used information from one, and only one, model. *Id.* 135:6-20.  In another
23  file, QSI_Steam, Penny used information from several models and combined them in one file. *Id.*
   68:23-70:1; 135:10-23; 137:7-12.  Within each file, Penny selected information that was relevant to
24  the model to include. *Id.* 73:1-8.  He did not include all information. He also did not organize them
   numerically. *Id.* 185:22-25.  He divided them into two sections, with simpler variables in the first
25  section, and more complex variable in the second section. *Id.* 68:23-70:1.  Within the second
   section, Penny divided each variable and created sets based on the variable's "primary index" and
26  "secondary index". *Id.* 132:3-133:4.  Penny repeated this pattern. *Id.* 180:23-181:09.  Penny then
27  encoded them to be read, per Jacobsen's standard, so they could be displayed in DecoderPro. *Id.*
   34:2-5.  While the individual data appear in QSI's manuals, neither the grouping, nor organization,
28  nor patterns, nor coding appear in the manuals. *See id.* 180:23-181:09.

No. C06-1905-JSW       MOTION FOR SUMMARY JUDGMENT

1   Dep. 41:2-12, 19-23.[7] JMRI programmers do not do this by mechanically cutting and pasting "raw

2   data." In some cases manufacturer data are incomplete, contradictory, or inaccurate and cannot be

3   turned into a functioning file.  Declaration of Robin Becker In Support of Motion for Summary

4   Judgment ¶¶4, 6.  Where programmers use manufacturer data to accomplish their goal, they select

5   some data and not others.  Shall Decl. ¶ 2; Penny Dep. 158:12-17; Mosher Dep. 40:3-13. As one

6   developer puts it, "the net result of these choices is a file that expresses my understanding of how a

7   decoder works and of the best way to present the decoder's functions to a railroader so the

8   railroader can make it do what he wants it to do." Shall Decl. ¶ 3.

9        This selection and arrangement is not only original in itself, it transforms the "raw data"

10   from an inert form typed on a piece of paper to an intuitive, interactive computer program. As one

11   developer puts it, the decoder files "had to be designed so that they would feed the information into

12   JMRI" for the particular format the developer chose.  Penny Dep. 34:2-11.  The files must work

13   with JMRI, but may or may not match standards promulgated by the NMRA, Mosher Dep. 34:24-

14   35:6; 128:8-12, and may or may not match the arrangement of a given manufacturer. *Id.* 138:18-

15   139:2, 11-19; 141:18-142:3.[8]

16        These choices satisfy copyright's originality requirement.   That requirement is not

17   stringent.  It requires only independent selection or arrangement that displays even "minimal"

18   creativity.  *Feist*, 499 U.S. at 349.  The necessary creativity exists unless "the creative spark is

19   utterly lacking or so trivial as to be virtually nonexistent." *Id.* at 360. Even "crude, humble, or

20   obvious" independent creation satisfies this standard. *Id.* at 345.   The   vast   majority   of

21   compilations pass this test.  *Id.* at 359.[9]

22        In particular, copyright extends to expression that reflects an author's judgment.  The Ninth

23   ────────────────────

24   [7] More than 2/3 of JMRI files trace their lineage back to Professor Jacobsen's original files.
     Jacobsen Decl. ¶10.
     [8] The files Defendants copied are read by the program and displayed to users.  *Id.* at 37:6-20.

25   Defendants thus not only misappropriated the foundation of the JMRI program, they
     misappropriated JMRI's selections as they appear to users.

26   [9] *Feist* provides an example of one that didn't.  The "white pages" directory in that cases listed
     telephone subscribers alphabetically by their last name and included their address.  No principle of

27   selection was used and this principle of arrangement did not originate with the plaintiff.  The
     directory at issue "failed because it was found to be completely devoid of originality." *CCC Info.*

28   *Servs. Inc. v. MacLean Hunter Market Reports, Inc.*, 44 F.3d 61, 65 (2d Cir. 1994).

Circuit so held in *CDN*, 197 F.3d at 1260.  The plaintiff in that case published prices of used coins; the defendant copied those prices but did not copy their arrangement.  The court found the individual prices original because the plaintiff surveyed market data (which it did not own) and exercised judgment distilling those data into a price estimate, which the court treated as a compilation of the surveyed data.  *Id.*  The exercise of judgment satisfied the "extremely low" standard of creativity established in *Feist.  Id.*[10]

For these reasons, Defendant KAMIND's admitted copying, modification, and distribution of JMRI's program is infringement.  Because Defendant Katzer is responsible for the products KAMIND ships, Katzer Dep. 58:6-11; 68:22-69:12, he is vicariously liable for that infringement.

## III.   Summary Judgment Is Appropriate On Three of Professor Jacobsen's Defenses to the Counterclaim

In November 2006, Defendant Katzer ███████ to QS Industries (QSI), a model train decoder chip maker, for the rights to what QSI's owner Fred Severson calls a "reference manual." Severson Dep. 30:16-17.  That manual contains data that two JMRI programmers, Howard Penny and Mike Mosher, used in part to write JMRI files for QSI decoder chips.  Defendants' counterclaim is based on this assignment and a later one like it.[11]  Three independent defenses bar this counterclaim.

### A.   The Undisputed Facts Show JMRI Programmers Had Permission to Reproduce and Distribute QSI Material

"A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement."  *Graham v. James,* 144 F.3d 229, 236 (2d Cir. 1998).  "The word 'license,' means permission, or authority; and a license to do any

---

[10] The *CDN* court found its holding consistent with the Second Circuit's holding in *CCC Information Systems.* In that case the court found that the division of used car prices into regions was a protectable arrangement of prices. 44 F.3d at 67. Other protected elements of arrangement included "(1) the selection and manner of presentation of optional features for inclusion; (2) the adjustment for mileage by 5,000 mile increments (as opposed to using some other breakpoint and interval); (3) the use of the abstract concept of the "average" vehicle in each category as the subject of the valuation; and (4) the selection of the number of years' models to be included in the compilation." *Id.*

[11] ████████████████████████

particular thing, is a permission or authority to do that thing." *Federal Land Bank of Wichita v. Bd. of County Comm'rs,* 368 U.S. 146, 154 (1961). This is true regardless whether the word "license" was used. "No magic words must be included in a document" to create a copyright license. *Radio Television Espanola S.A. v. New World Entm't, Ltd.,* 183 F.3d 922, 927 (9th Cir. 1999).

Although license is an affirmative defense, an accused infringer meets its initial burden by establishing that the license exists. The burden then shifts back to the copyright holder to show copying outside the scope of the license. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989) (copyright plaintiff bore burden of showing copying "beyond the scope of [defendant's] license; *Bourne v. Walt Disney Co.* 68 F.3d 621, 631 (2d Cir. 1995) (same); *Netbula, LLC v. BlindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1151 (N.D. Cal. 2007) (same).

The permission QSI granted Professor Jacobsen and the JMRI programmers constituted a license to use QSI material. In July 2006, four months before the initial assignment, Professor Jacobsen asked QSI owner Fred Severson whether JMRI programmers could use QSI data to write decoder definition files for QSI engines. Mr. Severson said yes:

> I stand behind that. I told [Professor Jacobsen] at the Detroit or the Pennsylvania meeting that we were at. . . . I had a clinic there. I think it was a clinic that I gave where Jacobsen was there. He says, you know, "Can I use your material to, you know, support my product?" And I said, "I'd love to have your product work with my product." And I still stand behind that. And I told Gerry [Pruss], when I came back, to give these folks the support that they need.

Severson Dep. 88:25-89:10; 110: 2-22. This permission explicitly extended to the manuals on which the counterclaim is based:

> What I told Bob is that he has access to information that we have in our manuals, reference manuals, regular manuals that are put out with the locomotives, to help him design his product so that it works with our product.

*Id.* 94:12-16. *See also* Severson Dep. 27:3-6; 88:19-21; 120:10-22

Mr. Severson instructed one of his employees, Gerry Pruss, to support the JMRI programmers in their work:

> In addition, I told Gerry that if the software writers for Decoder Pro need help in understanding how our products work, that he was authorized by me to give them as much help as he needed.

Severson Dep. 94:20-23. Mr. Severson's support was not charity—it benefited QSI as well as

1  JMRI.  *Id.* 168:6-7 ("it helps us if, you know, his product works with our product.  It helps him").

2         At Mr. Severson's direction and with his authorization, Mr. Pruss provided extensive

3  support to Mr. Penny and Mr. Mosher, including directing Mr. Penny to the QSI 3.0 manual, and

4  providing hundreds of pages which listed variable names and defaults.  Hall Decl. Ex. L, M. For

5  their part, the JMRI developers helped QSI by pointing out errors in the QSI materials; QSI was

6  grateful for the help.  Penny Dep. 74:20-25, 77:24-78:6; Pruss Dep. 32:15-19; Hall Decl. Ex. M

7  [RGJ_HP.00000024].    Mr. Severson also testified that he expected JMRI to contact him to

8  negotiate a formal license before releasing a product, Severson Dep. 170:12-171:15, and that he did

9  not interpret the above statements to grant JMRI the right to incorporate data into the JMRI

10  program.  *Id.* 164:7- 14.  There is no evidence in the record, however, that Mr. Severson or anyone

11  else from QSI expressed these expectations to Professor Jacobsen or anyone else at JMRI, or told

12  Jacobsen the permissions described above were limited in any way.  The only evidence is to the

13  contrary.    Jacobsen Decl. ¶51. Indeed, Mr. Severson was aware that JMRI developers used QSI

14  data to create software files, Severson Dep. 170:5-9, and even provided direct assistance in such

15  work himself, Hall Decl. Ex. N, but he never expressed any qualifications to the permission he

16  gave.  He did not even express reservations within QSI. As Mr. Pruss testified:

17       Q.     . . . were you authorized by Mr. Severson to send this information to JMRI
18       developers?

19       A.   To all customers, yes.

20       Q.    Okay.   All right.   And you knew they were using this to create decoder
         definition files?
21
         A.   That was our intent, for them to use it that way, yes.
22
   Pruss Dep. 41:13-19; 45:15-46:11; 46:24-47:5; 50:18-51:4; 69:4-17; 80:3-20.
23
          Mr. Pruss made clear his understanding that developers needed no formal license to use
24
   such materials.  He also confirmed that the information is available to thousands of people, none of
25
   whom is required to have a formal license to use the information.  Pruss Dep. 47:7-17. Thus, while
26
   the record does reflect private understandings Mr. Severson said he held, there is no dispute
27
   regarding what Mr. Jacobsen and the JMRI programmers were told.  They not only had permission
28

-14-

1   to incorporate QSI data in their files, they had QSI's active help in doing it.[12]   QSI has even

2   provided such assistance *after* the counterclaim was filed in February.   When Mike Mosher asked

3   for support on a new QSI file after that date Mr. Pruss not only provided it, he placed the

4   information on a Yahoo listserv. Mosher Dep. 62:24-63-25.

5        The scope of a nonexclusive license is a question of state law.   *Foad Consulting Group Inc.*

6   *v. Azzalino*, 270 F.3d 821 (9th Cir. 2001), analyzed under general principles of contract law.   Under

7   those principles an undisclosed intention or understanding (such as Mr. Severson's testimony

8   regarding a future writing) is irrelevant.   *E.g., Founding Members of the Newport Beach Country*

9   *Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 514 (Cal. App. Ct. 2003).

10  "Contract law gives effect to the parties' wishes, but they must express these openly." *Empro Mfg.*

11  *Co. v. Ball-Co. Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989).[13]

12       There is no question that QSI gave JMRI and its programmers permission to use the

13  material Defendants bought for purposes of asserting a counterclaim.   As a matter of law, that

14  permission was a nonexclusive license.   Defendants have not produced evidence showing JMRI

15  exceeded the scope of the license.   The court therefore should enter summary judgment in

16  Professor Jacobsen's favor on his license defense.

17      **B.**    **The JMRI Programmers' Use of QSI Material Was Fair**

18       Even if QSI had not licensed the work of JMRI's programmers, their use of QSI data would

19  be fair.   We show below that JMRI's use satisfies the nonexclusive factors listed in 17 U.S.C.

20  §107.   Even apart from the traditional four-factor test, however, JMRI's use was fair because QSI

21  gave JMRI permission to do what it did and even helped do it.   JMRI's developers acted in good

22  faith reliance on QSI.   *Cf. Fisher v. Dees*, 794 F.2d 432, 437 (9th Cir. 1986) (fair use defense

---

23

24  [12] This fact is significant because the assignment on which the counterclaim is based reserves to QSI the right to sublicense its data.   Declaration of Victoria K. Hall in Support of Administrative Motion to Seal [hereinafter Hall Sealed Decl.] Ex. A, B.

25  [13] Even if Mr. Severson had expressed qualifications to his permission, which he did not, the course of performance in which Mr. Pruss actively helped JMRI programmers develop the relevant files is sufficient to establish that in practice QSI interpreted the permission it granted to encompass the work Defendants now challenge. *Cf. Green Book Int'l Corp. v. Inunity Corp.*, 2 F. Supp. 2d 112, 119 (D. Mass. 1998) (course of performance belied claim that licensee needed special license to do things it had told licensor it would do).

26

27

28

1    affirmed even where permission to use was sought and denied).

2         Each of the traditional four factors weighs strongly in JMRI's favor.  First, the purpose and

3    character of JMRI's use of QSI data was transformative and not for profit.  The reference manuals

4    Defendants assert in their counterclaim are inert typed documents.  See Penny Dep. 38:18-39:15;

5    Mosher Dep. 32:9-13.   JMRI programmers transformed the data into the foundation for an

6    interactive computer program conferring substantial benefits on model railroaders.  This

7    transformation in function is analogous to the reproduction of pictures to create a searchable

8    database, which is fair use.  *Kelly v. Arriba Soft Corp.,* 336 F. 3d 811, 818-20 (9th Cir. 2003).

9    JMRI did not and does not charge for its software; anyone can download and use it, and anyone

10   can modify and distribute it subject to minimal conditions.  Jacobsen Decl. ¶ 29.

11        The fourth fair use factor—the effect of the copying on the market or potential market for

12   the work--is closely tied to the first, so we consider it next.  This factor weighs in JMRI's favor

13   because JMRI's copying did not displace QSI from any market and in fact benefited QSI.  QSI

14   does not sell the relevant manuals; they are freely available for download on its website.  Severson

15   Dep. 65: 17-20; Defendant's Response to Plaintiff's First Request for Admissions ("RFA

16   Response"), Admission Three.  Mr. Severson referred to the information as "public information"

17   and testified "it's out there.  Anybody can have it."  Severson Dep. 110:11-15.  He characterized

18   the information in the manuals as being "in the public domain." *Id.* 127:21-22.[14]

19        QSI gives away the data Defendants sue on here because QSI is a hardware company.  It

20   makes money from selling chips to run trains, not manuals. JMRI's software is a complement to

21   QSI's hardware: the software makes QSI chips easier to use and thus makes them more desirable.

22   *See* Severson Dep. 68:4-5; 92:8-9. Because JMRI's transformative use of QSI data displaces no

23   sales and in fact benefits QSI, that use is fair.  *Cf.* William F. Patry, *Patry on Copyright* §10.155

24   (2009) (transformative uses that increase sales of copied work weigh in favor of fair use on the

25   fourth factor).

26        Finally, JMRI's use of these data does not harm Defendant's market because Defendants

27   ─────────────────────

28   [14] Mr. Severson's testimony makes clear that by saying this he did not intend to state a legal
     conclusion and we do not claim he did.

-16-

have not attempted to make such a market. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendants' Response

to Jacobsen's Request for Admission No. 38. The record makes clear that it was this lawsuit, not

an economic market, that triggered the assignments on which the counterclaim is based. *Id.*; ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The second and third factors—the nature of the work and the amount and substantiality used--favor Jacobsen as well. QSI characterizes the relevant work as a reference manual. Its purpose is to help model railroaders program QSI chips, which is exactly what JMRI programmers used the manuals for. Severson Dep. 62:5-7; 159:18-22; Pruss Dep. 45:15-46:11. And because the programmers were writing software and not manuals, they used only a tiny fraction of the data in the manuals. To date, Mr. Katzer has identified only 169 words that were taken from one QSI manual. Hall Decl. ¶ 11, Ex. K. According to a word count of the manual, the manual contains over 65,000 words, *id.* ¶ 11, including isolated phrases such as "strobe light." The amount and substantiality of the words used are miniscule. Because all four factors favor Jacobsen, JMRI's use was fair.

**C.    Defendants' Counterclaim Is An Inequitable Tactic Barred By Laches**

Laches is an equitable defense that prevents a plaintiff who "'with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'" *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950 (9th Cir. 2001) (citation omitted). To establish the defense Professor Jacobsen must show that Defendants unreasonably delayed bringing suit and that this delay prejudiced him. *Couveau v. Am. Airlines, Inc.,* 218 F.3d 1078, 1083 (9th Cir. 2000).

The delay in this case is clear. Defendants bought the rights to the reference manuals asserted here in November 2006. Counterclaim ¶14.[15]   They waited 27 months to file their

---

[15] Defendant Katzer represented to QSI that Professor Jacobsen claimed rights in QSI material and had sued Defendants based on that claim. That is why QSI assigned the rights. Severson Dep. 37: 10-11; 52:11-15; 177:4-180:2. Mr. Severson evidently believed that this lawsuit would establish

Counterclaim.

Delay is unreasonable where it is a tactic. A plaintiff may not treat an infringement claim as an option, lying in wait to see whether the defendant's use of a work is profitable and suing only if it is. *Danjaq*, 263 F.3d at 954. Defendants' conduct in this case is even worse, for the assignment is a litigation tool only; it had no economic significance.

Prejudice is clear as well. "A defendant may . . . demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." 263 F.3d at 955. ████████████████████

████████████████████████████████████████████████

████████████████████████████████ ████ When Professor Jacobsen learned of the assignment, he contacted Severson multiple times to clarify the issue but Severson never responded. Jacobsen Decl. ¶¶ 51-52. ████████████████████████

████████████████████████████████████████████████

████████████████

If either Defendant Katzer or QSI had objected to the use of QSI material, that use would have stopped immediately. Mosher Dep. 65:11-19; Penny Dep. 128:12-14; Jacobsen Decl. ¶ 52. But had Mr. Katzer or QSI objected, Defendants would have no counterclaim to assert. Such lying-in-wait tactics are inequitable and bar Defendants' counterclaim.

For each of these reasons judgment should be entered in Professor Jacobsen's favor on Defendants' counterclaim for copyright infringement.

**IV.   Defendants Admit They Removed Copyright Management Information From JMRI Files Without Authorization; Partial Summary Judgment on Professor Jacobsen's DMCA Claim is Therefore Appropriate**

Defendants have long admitted reproducing JMRI code without reproducing author attributions and license information, which Professor Jacobsen contends is copyright management information under the DMCA. Defendants also admit they had no permission to omit such

his ownership in QSI data. *Id.*; 179:24-180:2. As noted above, Defendant Katzer's statements did not accurately represent Professor Jacobsen's claims. *See* Part II.B.3.

1  information.  Partial summary judgment on these elements of Professor Jacobsen's DMCA claim is

2  therefore appropriate.

3       Two subsections of Section 1202 provide the basis for Professor Jacobsen's claims.  17

4  U.S.C. § 1202(a) prohibits the knowing provision or distribution of false copyright management

5  information with the intent to induce, conceal, encourage, or facilitate infringement.   Section

6  1202(b) prohibits the intentional removal or alteration of copyright management information, or

7  the knowing distribution of altered copyright management information, where the person altering

8  or removing the information knows or has reasonable grounds to know that removal or alteration

9  will induce, enable, facilitate, or conceal an infringement. Section 1202(c) defines "copyright

10  management information" to include author's name, the copyright holder's name, the terms and

11  conditions for use of the work, information set forth in a copyright notice, and any links to the

12  information stated above.   17 U.S.C. §1202(c)(1)-(3), (6)-(7).  *See also Associated Press v. All*

13  *Headline News Corp.*, 608 F. Supp. 2d 454, 461-62 (S.D.N.Y. 2009); *McClatchey v. Associated*

14  *Press*, No. 3:05-cv-145, 2007 WL 776103 (E.D. Pa. Mar. 9, 2007) at *5.

15       Professor Jacobsen used an automated script to add the license and copyright notice to each

16  Decoder Definition File. Jacobsen Decl. ¶ 36.  There is no dispute that each JMRI file stated the

17  name of the author and that the file was licensed.  Jacobsen Decl. ¶ 34; see ¶ 48.  There is no

18  dispute that the Decoder Definition Files were accompanied by a license and that within the files,

19  there was a reference to the license.  *Id.* ¶¶ 34, 36.

20       There is further no dispute that the tool Defendants employed to translate JMRI files to a

21  format for use in their own program did not copy this information.  Katzer PI Declaration ¶13;

22  Defendants' Answer ¶107.[16]  Defendants acknowledge that they did not have Jacobsen's authority

23  to remove or alter Jacobsen's copyright management information. Defendants' Response to

24  Jacobsen's Second Set of Interrogatories, Interrogatory No. 4.  They also did not have Jacobsen's

25  authority to use their copyright management information in place of Jacobsen's.  Jacobsen Decl. ¶¶

26

27  [16] Similarly, there is no dispute that Defendants did not comply with the terms of the Artistic
License when they distributed the copied code. Answer ¶¶ 107, 108, 110.  Defendants therefore

28  distributed JMRI code in violation of its license terms, which is infringement.

32-33. Finally, there is no dispute that Defendant Katzer distributed his program with his own copyright information and not JMRI's.

Defendant Katzer has denied that he intended to remove JMRI's copyright management information or to deny JMRI developers proper attribution. Notwithstanding Defendants' admitted literal copying, therefore, there is a triable issue of fact regarding Defendants' knowledge and intention.

There is no such issue, however, regarding the deletion of JMRI's copyright management information during the process of Defendants' literal copying. Professor Jacobsen therefore moves for summary adjudication of the removal element of Section 1202(b). Because Defendants claimed to be the authors of a program that unlawfully copied JMRI code, Professor Jacobsen moves for summary adjudication of the distribution of false copyright management information element of Section 1202(a). Finally, because Jacobsen did not authorize Defendants' removal or alteration of copyright management information, and did not authorize Defendants to place their own copyright management information on the translated JMRI files, Jacobsen moves for summary judgment on the element that Defendants lacked authorization to make changes to copyright management information.

IV.     **CONCLUSION**

For the foregoing reasons, summary judgment in Professor Jacobsen's favor should be granted on his license, fair use, and laches defenses to the counterclaim, partially summary judgment should be granted on the liability elements of his cybersquatting and copyright claims, and on two of the liability elements of his DMCA claim.

Respectfully submitted,


DATED:  October 30, 2009                    By _____/s/_____
                                            David McGowan (CBN 154289)
                                            Warren Hall
                                            5998 Alcala Park
                                            San Diego CA 92110
                                            dmcgowan@sandiego.edu
                                            Telephone: 619-260-7973
                                            Facsimile: 619-260-2748

                                            ATTORNEY FOR PLAINTIFF