1  DAVID McGOWAN (SBN 154289)
   Warren Hall
2  5998 Alcala Park
   San Diego CA 92110
3  dmcgowan@sandiego.edu
   Telephone: 619-260-7973
4  Facsimile: 619-260-2748

5  VICTORIA K. HALL (SBN 240702)
   LAW OFFICE OF VICTORIA K. HALL
6  3 Bethesda Metro Suite 700
   Bethesda MD 20814
7  Victoria@vkhall-law.com
   Telephone: 301-280-5925
8  Facsimile: 240-536-9142

9  Attorneys for Plaintiff
   ROBERT JACOBSEN
10

11               UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14  ROBERT JACOBSEN,              )   No. C06-1905-JSW
                                  )
15              Plaintiff,        )   **REPLY MEMORANDUM IN SUPPORT**
                                  )   **OF PLAINTIFF'S MOTION FOR**
16       v.                       )   **SUMMARY JUDGMENT**
                                  )
17  MATTHEW KATZER, et al.,       )
                                  )   Date:       Fri., December 4, 2009
18              Defendants.       )   Time:       9:00 a.m.
                                  )   Courtroom:  11, 19th Floor
19                                )   Judge:      Hon. Jeffrey S. White
                                  )
20                                )
                                  )
21                                )
                                  )
22  _____)

Defendants' opposition papers point many fingers but offer few facts and almost no legal authority. As we show below, a substantial part of this case should be put to rest at this time.[1]

## I. Defendants Admit Three Elements of the Cybersquatting Claim and Present No Evidence Regarding the other Two

Defendants concede three of the five elements of cybersquatting.[2] Defs. Matthew Katzer & KAMIND Assocs., Inc.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. [hereinafter Defs.' Opp.] at 3. They assert there is a dispute regarding ownership of the "DecoderPro" mark, the first element of the claim, but they offer no evidence on this point. They cite only some discursive language in the complaint. Registration creates a presumption of ownership, *Sengoku Works, Ltd., v. RNC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996), and Professor Jacobsen's declaration in any event establishes his ownership. There is no contrary evidence and thus no factual dispute.

That leaves only bad faith. Congress listed eight factors relevant to the bad faith element. 15 U.S.C. §1125(d)(1)(B). Defendants do not discuss even one of them. Defendants concede by silence that Mr. Katzer registered as a domain a trademark he knew he did not own and did so to facilitate entry into a market. Defendants similarly do not dispute that they took affirmative steps to keep the mark from being transferred to its rightful owner. Pl.'s Mot. for Summ. J. [hereinafter Mot.] at 3.

Professor Jacobsen's moving papers cited *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2d Cir. 2000), for the proposition that bad faith is shown as a matter of law where a defendant registered a mark as a domain name to facilitate market entry and keep the domain away from a prospective competitor. Defendants do not deny the proposition and never

---

[1] The parties have agreed that their reply papers will not address the main copyrightability arguments raised by each side. These papers therefore address only Plaintiff's claim for cybersquatting and violations of the DMCA and Defendants' counterclaim.
[2] Professor Jacobsen must show he owns a valid and distinctive mark (i and ii) and that Mr. Katzer registered an identical or confusingly similar mark (iii and iv) in bad faith (v). *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2004). As relevant here registration is the predicate act; commercial use is not an element of the claim. *Id.*

cite the case.

Defendants argue that *after* they registered decoderpro.com a man named Jerry Britton registered as a domain a mark Defendants claim to own; Mr. Katzer then traded domain names with Mr. Britton.[3] The point is irrelevant. Professor Jacobsen had nothing to do with Mr. Britton's registration. Britton Dep. 34:1-35:6; 80:6-81:18; 97:16-99:14; 110:12-112:4. "He did it too" is not a defense to cybersquatting, particularly when that finger is pointed at what a third party did after Defendants' unlawful registration. Defendants' conduct is on all fours with conduct the Second Circuit found conclusive of bad faith in *Sporty's Farm*. Judgment in Professor Jacobsen's favor is therefore appropriate at this time.

## II.     Defendants' Counterclaim Arguments Raise No Genuine Issues of Fact

The following facts are recounted in Plaintiff's motion and are not disputed in the Opposition, which is mainly directed at the scope of the license at issue.

In early 2006 Fred Severson, co-owner of chipmaker QSI, gave Professor Jacobsen verbal permission to use what Mr. Severson referred to as QSI's "materials" or "information" to develop JMRI files that work with QSI chips. Mot. at 13. Mr. Severson also testified such materials were freely available on the Internet and in "the public domain." *Id.* at 16. Undisputed testimony showed that QSI makes such material freely available to thousands of people registered on a QSI listserv run by Yahoo. *Id.* at 14.

In keeping with the permission he granted, Mr. Severson instructed QSI employee Gary Pruss to assist JMRI developers in their work. Mot. at 13. A very tall stack of documentary evidence--more than 600 pages-- shows that Mr. Pruss did so beginning in 2005 and continuing to date, and that his assistance included both numeric data (values for particular variables) and QSI variable descriptions, which are the focus of the Opposition papers. To this day no one from QSI

---

[3] Professor Jacobsen subsequently had to get the domain back from Mr. Britton in a collateral proceeding under the UDRP. *Jacobsen v. Britton*, Case No. D2007-0762 (WIPO July 26, 2007)

has ever repudiated this assistance or claimed it exceeded the scope of authority Mr. Severson gave Mr. Pruss.

> Ordered Sealed by Court [Docket #388]

Notwithstanding QSI's prior grant of permission to use its materials, neither Defendants nor QSI asked JMRI programmers to stop work once the assignment was made. To this day QSI has not asked JMRI programmers to stop their work. Since taking the assignments Defendants have done nothing to create a market for these manuals.

We argued in our moving papers that the counterclaim is a sandbagging tactic that has multiplied these proceedings needlessly. As we show below, the law and the undisputed facts establish three separate defenses that warrant putting an end to this diversionary tactic.

### A.   Defendants Have Failed To Submit Evidence Establishing Breach of A License The Undisputed Facts Show Was Granted

Defendants do not deny that Mr. Severson gave Professor Jacobsen and JMRI permission to use QSI materials to develop JMRI files. Defendants do dispute the scope of that permission. They say it extended only to default values (numbers) used in certain variables and not to the descriptions of those variables. Defs.' Opp. at 7.

Defendants' argument creates no factual conflict relevant to the license defense because they assert an <u>unexpressed</u> limitation to an <u>express</u> permission. In the testimony quoted in the opposition papers Mr. Severson stated that in giving his permission he *"didn't say anything about descriptions."* Jerger Decl., Ex. 2, pages 2-5 (emphasis added). That is quite literally true. Five people have submitted evidence regarding Mr. Severson's permission: Mr. Severson himself, Mr. Pruss, Professor Jacobsen, Howard Penny, and Mike Mosher. Not one of them testified to any

[Docket # 156], App. A.

express limitation placed on the permission Mr. Severson gave JMRI.

In our moving papers we specifically noted that Mr. Severson had testified that he understood his permission to be qualified in certain ways but that there was no evidence he had expressed these qualifications to anyone, even within QSI. Mot. at 14. We noted that once the existence of permission has been shown (and now conceded) the burden shifts to Defendants to show any limitations to that permission. *Id.* at 12. Finally, we cited authority showing that unexpressed limitations do not limit the scope of the permission granted. *Id.* at 14.

Notwithstanding this discussion, Defendants' Opposition presents no evidence showing that the "numbers only" limitation they now claim was ever expressed to anyone. "[U]ndisclosed intent or understanding is irrelevant to contract interpretation," *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 514 (Cal. App. Ct. 2003), and Defendants' proposed limitation therefore does not meet their burden of showing that the activities of JMRI developers exceeded the scope of the permission QSI gave them.[4]

Even if QSI's permission to use its "material" or "information" might be thought ambiguous, the only relevant extrinsic evidence supports Professor Jacobsen's defense. In this case there is unambiguous and undisputed evidence of a lengthy course of performance over several years in which QSI employee Gary Pruss provided JMRI programmers (as well as thousands of other people on QSI's Yahoo listserv) with the descriptions whose use Defendants now say were outside the scope of permission.

Mr. Severson did so with the explicit understanding that these data would be used in JMRI work. In reviewing one approximately 200-page document Mr. Pruss sent to a JMRI developer, Mr. Severson testified:

> You know, in my personal opinion, it looks like Gerry did these guys a favor by concatenating the information that was already available in a format that made it easy for them to incorporate it into their product. That's my guess. And then Gerry

---

[4] This case exemplifies the reason for this rule. JMRI developers can only go on what they are told. They cannot probe Mr. Severson's mind for unexpressed thoughts. Mr. Severson did not have to give permission in the first place. Having given permission in general terms, however, if Mr. Severson wanted to impose a particular restriction on the scope of his permission he needed to say something. He never did. There is no factual dispute on that point.

could certainly be able to answer that. But that's exactly what it looks like. But yeah, I mean, he had my authorization to send this kind of information out. This is just straight information that's available...in the reference manual and in CV Manager.

Severson Dep. 127: 4-14.

Defendants argue Mr. Pruss had no authority to grant a license. Defs.' Opp. at 9. Even if true this point makes no difference. Mr. Severson granted permission on behalf of QSI; no one disputes that. Mr. Pruss's conduct is relevant to interpret the scope of that permission. Defendants do not dispute that his work constituted an affirmative course of performance of QSI's permission. Such undisputed course of performance evidence cinches the license defense because there is no contrary evidence relevant to interpreting the permission everyone acknowledges was granted. *Green Book Int'l Corp. v. Inunity Corp.*, 2 F. Supp. 2d 112, 119 (D. Mass. 1998) (course of performance belied claim that licensee needed special license to do things it had told licensor it would do).

### B. Defendants' Fair Use Arguments Are Irrelevant And Unsound

Defendants' fair use arguments are accusatory and for the most part legally irrelevant. Defendants do not dispute that JMRI's use of QSI material was transformative, which is the key to the first fair use factor. They also claim no harm to the market for the QSI manuals, and indeed do not dispute facts showing that there is no such market. These are the key facts in the first and fourth fair use elements, which go to the heart of the economic effect of a use.

Defendants do make a number of accusations. On the first element they speculate that JMRI might become a for-profit venture in the future. They offer no evidence to support that speculation, however. The only record evidence is to the contrary. Decl. of Robert Jacobsen in Supp. of Reply Mem. [hereinafter Jacobsen Reply Decl.] ¶¶ 1-4. Defendants also cite a letter describing sales involving JMRI; it refers only to sales by people who have developed customized versions of JMRI software, bundled it with other products, and sold the bundle. *Id.* There is no evidence that the material at issue—QSI descriptions—is sold for a profit. That is because it is

not.[5]

As to amount and substantiality of use, Defendants do not really dispute that JMRI programmers used a small amount of the reference manuals, certainly an amount reasonable in relation to the manuals as a whole and in relation to what was needed to write the files. *Cf. Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 920-21 (9th Cir. 2003) (copying entire work was reasonable because necessary to achieve functional transformation). Defendants' basic argument is that if they can be sued over the 102 files of JMRI code they copied then they can sue back for 169 words from a 65,000-word manual. Mot. at 17; Defs.' Opp. at 10-11. This argument again confuses rights in particular terms originating with QSI with rights in files that select and arrange such terms.

Finally, Defendants argue that JMRI's use has harmed QSI. Defs.' Opp. at 11. The record is to the contrary: Defendants do not cite Mr. Severson's direct response to that question:

> Q. Okay. Does JMRI's QSI decoder definitions hurt the market for your product?
> A. Not that I am aware of.

Severson Dep. 68: 4-6.

Defendants instead quote Mr. Severson's testimony that Professor Jacobsen "sued a business associate over stuff that I wrote" and that "Microsoft would drop me like a hot potato if they didn't think that I had ownership of my own copyrighted material." Defs.' Opp. at 10. Mr. Severson quite understandably feels that "if JMRI is claiming ownership of this material, then that is completely unacceptable to me." Severson Dep. 90:6-7.

These passages do not refer to a risk of harm from JMRI's use of QSI data. They refer instead to a risk that QSI would be harmed if Professor Jacobsen claimed to own QSI data. As we noted in our moving papers, Professor Jacobsen does not and never has made such a claim. Mr. Severson did not testify otherwise. Mr. Severson's information came from Mr. Katzer: "I was

---

[5] Defendants also complain that JMRI seeks profits because Defendants have been sued for copyright infringement. This complaint is irrelevant to fair use analysis. Defendants have been sued for violating even the very generous terms of the Artistic License, not for simple downloading (for which they, like everyone else, paid nothing). Nor is there any analogy between the parties' conduct. Defendants have been named because, in Mr. Katzer's words, "we grab the JMRI data and place it into our format," Decl. of Victoria K. Hall in Supp. of Reply Mem. [hereinafter Hall Reply Decl.] Ex. C, and because they did so for all 102 JMRI files, not just a small amount of data in a larger reference manual, Jacobsen Reply Decl. ¶¶ 5-7.

informed by Matt that, you know, he was being sued on stuff that I had written. Before that, no, I didn't have any reason to believe that." Severson Dep. 95:2-4.

Mr. Severson has been misinformed. He testified to a risk that does not exist because it is based on a claim that is not and never has been asserted. Professor Jacobsen submits that the misstatement of his claim as a means to obtain the assignment on which the counterclaim rests further establishes the fairness of JMRI's use of QSI data. The traditional fair use factors point to the same conclusion on their own. Transformative use of information made available for free is fair, particularly when done with permission.

### C. Defendants Do Not Deny Delaying Their Counterclaim and Present No Evidence Disputing Prejudice to Professor Jacobsen

We showed in our moving papers that a copyright claim is barred by laches if the claimant delayed bringing the claim and the accused infringer suffered prejudice due to the delay. Defendants do not dispute the rule and concede delay. Defendants argue instead that they were more concerned with QSI's rights than with suing Professor Jacobsen.

Professor Jacobsen objects to Defendants' assertion regarding their own motives. When this topic was broached at his deposition Mr. Katzer foreclosed questioning with an assertion of privilege. Katzer Dep. 43:17-21. We of course do not question Mr. Katzer's assertion. But having foreclosed examination Mr. Katzer should not be allowed to assert motive arguments now.

As to QSI, its motives are irrelevant to laches analysis because QSI is not the counterclaimant. In addition, as shown above QSI is not concerned to stop JMRI's work but only to establish its own claim of right, which Professor Jacobsen does not and never has contested. Finally, even taken at face value Defendants' argument does not work. Mr. Severson testified he sought to establish his ownership through this case. Defs.' Opp. at 12. Nothing in this premise justifies delay in bringing the counterclaim. If anything such a motive would have implied prompt action; there is no evidence QSI sought to delay the counterclaim.

As to prejudice, Defendants argue that Professor Jacobsen suffered no prejudice because Defendants no longer seek the $6 million in damages alleged in the counterclaim but only the value of a license. Defs.' Opp. at 12. This argument is unsound because without the delay there would be no claim at all. Both Professor Jacobsen and the JMRI developers testified that JMRI would have stopped use of QSI data had QSI objected. There is no contrary evidence.

Defendants finally argue that JMRI's continued support for QSI decoders contradicts this claim. Defendants' argument is not evidence and in any event is unsound for more fundamental reason. [Ordered Sealed by Court [Docket #388]] It has never asked Professor Jacobsen or the JMRI programmers to cease work on its decoders. When asked at his deposition whether he wanted JMRI support for QSI chips to cease Mr. Severson stated: "I don't think I care." Severson Dep. 56:6.

JMRI continues to support QSI chips because Mr. Severson's position in this case is based on misinformation and because QSI continues to provide information to JMRI developers to create decoder definition files for QSI chips. There is no reason to believe Mr. Severson objects to JMRI's work and therefore no reason for that work to stop.

### III. Defendants Do Not Deny Removing JMRI License Information and Author Names, Which Are Copyright Management Information As A Matter of Law

Professor Jacobsen's motion showed that Defendants' copying removed from JMRI files copyright management information, as that term is defined in 17 U.S.C. §1202(c), and that Defendant then distributed the code in a program under their own claim of right. Defendants do not deny these points.

Defendants argue there is a factual issue regarding whether JMRI's copyright management information was part of or the product of an automated system. Def's Opp. at 13. We would agree with this point if Section 1202 applied only to automated systems, but that premise is incorrect.

The relevant statutory language provides that author and license information is copyright

8

management information; the language adds no "automated" element to this definition. 17 U.S.C.§1202(c)(1)-(3), (6)-(7). That is reason enough to reject Defendants' proposed narrowed reading. *Stewart v. Abend*, 495 U.S. 207, 233-235 (1990), endorsed a "plain language" approach to interpreting the Copyright Act and rejected primary reliance on legislative history inconsistent with that language. The Ninth Circuit has followed suit. *Ets-Hokin v. Skyy Spirits, Inc.* 225 F.3d 1068, 1079 n.9 (9th Cir. 2000). Similar authority led the most recent courts to decide the issue to reject the construction Defendants urge here. *Fox v. Hildebrand,* No. CV 09-2085 DSF (VBKx), 2009 WL 1977996 (C.D. Cal. Jul, 1, 2009) (rejecting narrowing construction of provisions at issue here); *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 461-62 (S.D.N.Y. 2009); *McClatchey v. Associated Press*, No. 3:05-cv-145, 2007 WL 776103, at *5 (W.D. Pa. Mar. 9, 2007).

The one case Defendants cite, *IQ Group, Ltd., v. Wiesner Pub.*, LLC, 409 F.Supp.2d 587, 598 (D. N.J. 2006), rests on legislative history as opposed to unambiguous text. Under the cases cited above it is unsound for that reason alone. More substantively, the *IQ Group* court mistakenly reasoned that because 17 U.S.C. §1201 pertains only to "technological measures" therefore Section 1202 should be construed to do so as well. 409 F. Supp. 2d at 597. But Congress did not define copyright management information for Chapter 12 as a whole; it explicitly defined the term only "*as used in this section*" 1202. 17 U.S.C. §1202(c) (emphasis added). The *IQ Group* court not only added statutory text Congress did not include it contradicted the language Congress chose.

The court's legislative history analysis also was flawed. As the court in *Fox* noted recently, "The Court in IQ Group, Ltd. quotes--and then ignores--the Senate committee report that indicates that the Senate meant exactly what it said in the unambiguous text of § 1202." 2009 WL 1977996 at *3 n.3. That is true. Like the statutory text, the committee reports said nothing about automated systems. 409 F. Supp. 2d at 596.

As a policy matter the reasoning in *IQ Group* implies a contrary result here. The court there found "facilitating licensing on the Internet, discouraging piracy, and establishing an efficient Internet marketplace" to be the main purposes of 17 U.S.C. §1202. *Id.* at 596. Defendants here stripped from JMRI files the identity of the files' authors, the copyright notices, and information regarding the license governing the files. Such acts destroy licensing markets, not enable them. One cannot contract efficiently with an unknown author whose work is distributed without its terms of use. Defendants' acts facilitate piracy, not efficiency. Defendants' call for the court to alter plain statutory language therefore should be rejected.

For the foregoing reasons, Plaintiff's Motion should be granted.

Respectfully submitted,

DATED: November 19, 2009        By _____/s/_____
                                David McGowan (CBN 154289)
                                Warren Hall
                                5998 Alcala Park
                                San Diego CA 92110
                                dmcgowan@sandiego.edu
                                Telephone: 619-260-7973
                                Facsimile: 619-260-2748

                                ATTORNEY FOR PLAINTIFF